JOHN GRAHAM *vs.* CHARLES L. BADGER & another.

Norfolk.    March 26, 1895. — June 20, 1895.

Present: FIELD, C. J., HOLMES, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Due Care — Negligence — Defective Appliance — Instructions.*

In an action for personal injuries caused by the fall of an iron block from a derrick upon an employee, which fall was due to the breaking of a rope at a point where it had been spliced, the weight attached to the rope not being sufficient to break or to endanger the apparatus, if in proper condition, the defendant has no ground of exception to a refusal to rule that the mere breaking of the rope was not *prima facie* evidence of negligence on the part of the defendant, and to an instruction to the jury that if they found that the rope was defective while in the defendant's care, that fact was evidence which, unexplained, would warrant them in finding that the defendant was negligent. *Res ipsa loquitur.*

If an employee had a right to expect due care from his employer as to his perma-
nent appliances, and there was evidence that he was employed to do what he
was doing, and that his position was seen by his employer, and it may be that the
doing of his work required him at moments to be in the position he was in when
injured, it cannot be said as matter of law, in an action for his injuries, that he
was negligent in being where he was.

TORT, for personal injuries occasioned to the plaintiff by the
fall of an iron block from a derrick upon him while in the de-
fendants' employ. The declaration contained four counts, the
first at common law, and the other three under St. 1887, c. 270,
§ 1, cls. 1, 2. At the trial in the Superior Court, before *Ham-
mond*, J., there was evidence tending to show that the plaintiff,
who had been employed by the defendants for about six years,
had for the two years previous to the accident been engaged
in the quarries of the defendants, assisting about derricks, and
doing any work connected with them that was required of him;
that at the time of the accident he was working with one Fur-
bush in moving a finished stone by means of a boom derrick,
and was standing beside the stone to guide it, and almost under
the iron block hereinafter mentioned; that the stone, which
weighed from two hundred to four hundred pounds, was sus-
pended by a rope attached to a hook at the bottom of the iron
block of the derrick, and his back was to the mast of the der-
rick; and that this iron block, which weighed about half a ton,
was suspended about six or eight feet in the air by means of
a rope or fall, which ran from the iron block up to the top of
the mast of the derrick to a small block with a sheave in the
middle of it, through which it ran, and then ran down the mast
to a block at the foot, and then connected with the drum of the
engine.

While the plaintiff and Furbush were moving the stone,
Furbush having his face to the mast and being some distance
away from under the block, the fall parted between the end of
the boom and the top of the mast, causing the block to fall upon
the plaintiff, and to injure him.

There was evidence for the defence that this fall rope, which
was the best manila, had been purchased in January previous
to the accident, which happened in May, and that several weeks
before the accident it broke while the derrick was in use lifting
a stone which weighed from ten to twelve tons. One Willey,

the foreman of the defendants' stone yard, then discarded part of this fall rope, and spliced another piece on to what was left, and replaced the rope on the derrick. Several witnesses testified that ropes spliced as this one was were as strong as new ropes. It also appeared from the evidence, that, at the time of the accident in which the plaintiff was injured, the rope parted in this splice.

The plaintiff contended that the rope or fall had become worn from previous use, and that its parting was due to the negligence of the defendants in not properly inspecting it, and in allowing it to be in a defective and unsafe condition.

The defendant contended that all ropes are liable to kink, and that this being a new rope, and at the time having but a light load upon it, was more likely to kink, and that the accident must have happened through the kinking of the rope and its subsequent cutting in the sheave at the head of the mast, and that the position of the block, about six or eight feet above the ground, with reference to that portion of the rope which parted, showed conclusively that it must have parted by being cut by the sheave.

The plaintiff testified, that on the day of the accident he was told by Willey to get some stone; that Furbush asked him to help with this particular stone; that at the time he was hurt he was getting on a stone to bring from the stone shed over to the polishing shop to be polished, which stone was two feet square and eight inches thick; that it was about a foot out from under the swing of the derrick; that he was standing between it and the boom of the derrick; that as the stone was a finished one, he was holding it to keep it from striking another stone there; that one man could have turned this stone around alone; that Furbush did not have hold of the stone, but had hold of a tag rope which was fastened to the end of the boom; that the plaintiff had placed a rope around the stone and fastened it to a hook in the iron block which weighed about half a ton; that Furbush sang out to hoist, and the fall rope broke, and the iron block fell and struck him; that there was no tag rope on the iron block or on the stone; that the tag rope on the boom was to pull the boom around after the stone had been lifted high enough; that if the defendants were hoisting heavy stone they would warn

him to look out for a chain breaking or something; and that at the time of the accident he did not know of any defects in the rope.

There was evidence for the defendants tending to show that it was the duty of the plaintiff to take stones to the polishing shop, and to and from other places; that it was not a part of his duty either to hoist or to move the stone; that Furbush was at the yard to put stone on to the wagon for the teamsters; that the stones which were put on to a one-horse team weighed from two hundred to two thousand pounds or more, and that the inside purchase or rope was so regulated that the stone would hoist straight; that it would mar the stones to knock against one another; that the teamsters generally helped to load and unload stone, and were permitted so to do; that the plaintiff's duty was to drive, and he did not have to help load and unload; that the rope, which was made of five strands, and was rove through the block, was an inch and a quarter in diameter, and that the block was about an inch and three quarters in diameter, made of sheet steel, and allowing ample room for the rope or fall to pass through it, even when spliced; that the rope ran from the stone through the snatch block about forty feet to the drum of the engine; that there was a tag rope on the end of the boom; that there was no cut in the rope when the stone was taken out of the wagon, five minutes before the accident happened; that the rope was put in by Willey, or under his directions; that a few weeks before the accident the rope parted when hoisting a very large stone, and Willey got a new piece of rope and spliced it together after taking out about half of the fall rope, which was used up; that the strands were wound in and around one another, so as to make a rope when spliced which would hold as well as a new rope; that this splice was well done; that in putting in new falls they were troubled with kinks and had to take them out; that this rope, being practically a new rope, would be likely to kink if there was any slack in it; that no rope if kinked would stand it when brought against the block at the masthead; that there was no way to guard against these kinks; that the defendants' theory was that the rope had kinked and the kink had caught in the masthead; that the defendants made no objection to the plaintiff and Furbush hoisting the stone; that the plaintiff was

standing almost, but not directly, under the block; that everything was safe and good at the time, including the fall rope; that "the break looked as though two strands had been cut, or, in other words, as though they had been drawn over a sharp edge or something"; that the thread was pulled out; that these ends "were just pulled out into a kind of brush end, the same as any rope would part, scraggy ends; that they were not a smooth cut, but practically what one would call kind of a chaw cut, kind of chawed off"; that this fall rope had been exposed to the weather since January 15, 1893; and that a spliced rope is as strong as a new rope, and a new rope is more liable to kink than an older one.

There was also expert evidence tending to show that the rope was as good as could be bought; that the fall, as exhibited, was first class except where it was worn; that what they call a long splice, made by unravelling and drawing the strands together for a certain distance and then by tucking them under, as in the case of this fall, made a proper splice, and that the relative strength is usually stronger on the splice; that there are the same number of strands in the splice, but with the ends it makes more strands; that it would run through a one and three quarters inch sheave all right; that there was no way to prevent kinks, nor to detect them, and that if a rope when kinked caught against anything like the block at the top of the mast it would cut it off; that splices were stronger and would wear longer than the original rope; and that a new rope was a little more likely to kink than an old one.

There was also other evidence in support of the plaintiff's contention that the splice was made in the best possible manner; that there was nothing the matter with the rope; and that the way it was cut showed that there must have been a kink.

At the close of the testimony, the defendants requested the judge to rule: 1. That upon all the evidence the plaintiff could not recover. 2. That the mere breaking of the rope was not *prima facie* evidence of negligence on the part of the defendants.

The judge refused so to rule, and, among other things, instructed the jury that, if they found that the rope was defective while in the defendants' care, that fact was evidence which, un-

explained, would warrant them in finding that the defendants were negligent. The defendants alleged exceptions.

*J. Lowell, Jr.*, ( *G. W. Wiggin & S. H. Smith* with him,) for the defendants.

*W. S. Pinkham*, (*J. D. Long* with him,) for the plaintiff.

HOLMES, J. This is an action of tort to recover for personal injuries caused by the fall of an iron block from a derrick upon the plaintiff, who was working in the defendants' employ. The fall was due to the breaking of a rope at a point where it had been spliced. The weight attached to the rope was not sufficient to break or to endanger the apparatus if in proper condition. The main question is whether the judge before whom the case was tried was right in refusing to rule that the mere breaking of the rope was not *prima facie* evidence of negligence on the part of the defendants, and in instructing the jury that, if they found that the rope was defective while in the defendants' care, that fact was evidence which, unexplained, would warrant them in finding that the defendants were negligent.

We are of opinion that the instruction was correct. *Res ipsa loquitur*, — which is merely a short way of saying that, so far as the court can see, the jury from their experience as men of the world may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case. Presumptions of fact, or those general propositions of experience which form the major premises of particular conclusions of this sort, usually are for the jury. The court ordinarily confines itself to considering whether it can say that there is no such presumption, or, in other words, that such accidents commonly are not due to negligence. See *Doyle* v. *Boston & Albany Railroad*, 145 Mass. 386, 387, 388; *Howser* v. *Cumberland & Pennsylvania Railroad*, 80 Md. 146.

It may be true that a rope properly spliced is stronger at the splice than elsewhere. But the jury might infer from the breaking that this rope had not been spliced properly. One witness who examined it testified that, so far as he could see or understand, the splice drew apart. At all events the rope broke at the

place where it had broken before and had been spliced, and it was for the jury to say what they would infer from that fact. Of course they were not bound to believe the testimony for the defence if it seemed to them incredible. We cannot say that they were wrong in rejecting the explanation that the rope probably kinked and caught in a wheel. Neither can we assume that the defect, if there was one, was hidden. If the jury were of opinion that defects in ropes great enough to make them break under a strain slight in proportion to the normal power of rope generally can be discovered by proper inspection, we know nothing to the contrary. It might be otherwise in the case of an iron chain.

We cannot say that the plaintiff was negligent. He had a right to expect due care from the defendants as to their permanent appliances. There was evidence that he was employed to do what he was doing; his position was seen by one of the defendants, and it may be that to do his work called on him at moments to be nearly under the block. *Snow* v. *Housatonic Railroad,* 8 Allen, 441, 450. *Hackett* v. *Middlesex Manuf. Co.* 101 Mass. 101. *Spicer* v. *South Boston Iron Co.* 138 Mass. 426. *Kilroy* v. *Foss,* 161 Mass. 138.　　　　　*Exceptions overruled.*

---

EDITH SISE *vs.* ZABDIEL A. WILLARD & another, trustees, & others.

Suffolk.　　December 5, 1894. — June 21, 1895.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, & LATHROP, JJ.

*Life Interest — Termination of Trust.*

A bill in equity to compel an absolute transfer to the plaintiff of a fund held for him by the trustee under a will cannot be maintained, if his interest in the fund is only a life interest coupled with a power of testamentary disposition.

FIELD, C. J. This is a bill in equity, brought by Edith Sise, one of the daughters of John Ware, late of Boston, deceased, testate, against the two trustees under his will, one of whom is

her husband, and, by amendment, the surviving wife and other children of said John Ware, and the children of the plaintiff have been made parties defendant. The first wife of the testator was living at the time the will was made, but died in the lifetime of the testator, and he married again, and made provision by a codicil for his second wife, who survived him. At his death he also left five children, all of whom are still living.

The object of the bill is to compel an absolute transfer to the plaintiff of the fund held for her benefit by the trustees, under the fourth and fifth articles of the will. The youngest of the children of John Ware has already attained the age of thirty-five years, and the property given in trust has been divided into six equal shares, and the trustees have set apart for the plaintiff one of these shares, which they hold in trust for her benefit, and the income of which they have paid to her from time to time. The children of the testator are one son and four daughters, and the share of the son was conveyed to him, in accordance with the provisions of the will, when the youngest child of the testator reached the age of thirty-five years.

The contention of the plaintiff is that the entire beneficial interest in the share set apart for her benefit belongs to her, and that she is entitled to have the trust terminated and this share of the property absolutely transferred to her. The contentions of the respondents are, that the plaintiff has an equitable interest in this share for her life only, with the power of testamentary disposition, and that the remainder after her death goes either to her issue, if she leave issue, or to the heirs or distributees of the testator, unless she makes some disposition of it by will or by an instrument in the nature of a will. They also contend that, if this is not so, and she has the entire beneficial interest, the will of the testator should be carried out during her life, and that the intention of the testator concerning the shares allotted to his daughters is clearly expressed in the will, in the following sentence of the fifth article: " But as to the shares of the said property which shall be set apart for my daughters, it is my will that the said trustees shall continue to hold them in trust for their benefit, and shall continue to pay over to them the income from their respective portions for their sole use, and upon their own receipt in writing, so long as they shall live," etc.

By the sixth article of the will the testator made provision for the issue of any child, in case any of his children should die leaving issue before his youngest child reached the age of thirty-five years, and without having disposed of his or her share of the property by will, but he made no provision in terms for the disposition of the share of the property allotted to his daughters, if any of them, after his youngest child attained the age of thirty-five years, should die leaving issue, and without having made a testamentary disposition of her share.

There is no provision in terms in the will for the disposition to be made of the share of the property allotted to each child, in case any child should die without having disposed of his or her share by will, and without leaving issue, whether the child die before or after the testator's youngest child reached the age of thirty-five years, although the son's share after that time became his absolute property, and would descend in the same manner as his other property.

Considering all the provisions of the will, we are of opinion that the plaintiff took only an equitable life estate. Up to the time when the division was to be made of the property into shares, the trust property was to constitute one trust, the income of which was to be paid in equal shares to all the children, and if any child died leaving issue and without having disposed of his or her share by will, his or her issue were to take their parent's share of the income; and when the time came for division, such issue were to take their parent's share of the principal. Up to that time, undoubtedly, the children of the testator had only a life interest, coupled with a power of testamentary disposition. When the time came for a division of the property into shares, the son's share was to become his absolute property, but each daughter's share was to remain in trust on a separate trust for her life, with the power of testamentary disposition, but that is all the change which the will in terms provides for.

If it be implied that on the death of each daughter after the division her share shall go to her issue, if she leave issue and make no testamentary disposition of the property, still such issue would take as legatees under the will, and not as heirs or distributees of their mother. There is absolutely no provision that on the death of any of the children without issue before

the division, or on the death of any of the daughters without issue after the division, if no testamentary disposition has been made, the share of each child shall go to his or her heirs or distributees. The gift is to the trustees, and the children take only equitable interests, and up to the time of the division this interest is clearly for life. After the division the son's share is absolute, and each daughter's share is to be held on a separate trust, but we can find no language in the will by which the interest of the daughters in the property is enlarged; it still remains, we think, an interest for life. *Collins* v. *Wickwire,* 162 Mass. 143. This is the principal distinction between the present case and *Forbes* v. *Lothrop,* 137 Mass. 523. The court in that case, from the language of the will, and particularly from the clause that at the death of the wife the whole property was "to be equally divided among all my children and their heirs by right of representation," decided that the intention of the testator was to give to his daughter Mary the whole equitable interest in her share, which would pass to her heirs or distributees if she at her decease made no disposition of it "by will or otherwise." We can find no equivalent words in the present will. In the view we have taken of the extent of the plaintiff's interest in the share set apart for her, it is unnecessary to consider whether, if the whole beneficial interest in the share absolutely belonged to her, she would be entitled to a decree for a conveyance, against the clear intention of the testator that the share should be held in trust for her during her life.