## MISSOURI, K. & T. RY. CO. v. TAYLOR.

(3 cases) Nos. 7555, 8364, 9137—Opinion

Filed Jan. 22, 1918.

(170 Pac. 1148.)

**1. Master and Servant—Federal Employer's Liability Act—Negligence—Presumption.**

In an action for personal injuries by a servant against the master, where at the time of the injury the parties are engaged in interstate commerce, the fact of the accident carries with it no presumption of negligence on the part of the master; it being an affirmative fact for the servant to establish that the master has been guilty of negligence.

**2. Trial — Instruction—Evidence —Request —Scope.**

The scope of an instruction is not to be determined alone by the pleadings, but also by the evidence in support of the issues between the parties, and, although an issue is presented by the pleadings, it is not error to refuse a requested instruction thereon, even if it is abstractly correct, where there is no basis for it in the evidence.

**3. Master and Servant—Contributory Negligence—Recovery.**

Where an injury is not the result of an act done in disobedience of the rule of a railway company, but is caused by the negligence of the company, with which the violation of the rule has no proximate connection, an employe may recover therefor, although he has failed to obey such rule.

**4. Appeal and Error—New Trial—Discretion of Trial Court—Motion for New Trial.**

The granting or refusal of a new trial on the ground of newly discovered evidence is a matter largely within the judicial discretion of the trial court, and, unless it appears that such discretion has been abused, the ruling of the court will not be disturbed upon appeal.

**5. New Trial—Discretion of Trial Court—Refusal of New Trial.**

In an action for personal injuries, it is not an abuse of discretion to refuse a new trial on the ground of newly discovered evidence not affecting the main issues, but bearing only on the measure of damages, unless such evidence is of so convincing a character that had it been offered at the trial the verdict would have been clearly excessive.

**6. New Trial—Grounds — Failure to Present Case.**

A party is entitled to his day in court, and to have a fair and reasonable opportunity to present and establish his claim or defense, and his failure so to do when he has been afforded such opportunity, in the absence of exceptional facts excusing him, will afford no basis for a new trial.

(Syllabus by Bleakmore, C.)

Error from District Court, Bryan County; Jesse M. Hatchett, Judge.

Actions by Marcus L. Taylor against the Missouri, Kansas & Texas Railway Company. From a judgment for plaintiff, and the denial of petitions for a new trial and for the vacation of the judgment, defendant brings error. Affirmed.

Clifford L. Jackson, W. R. Allen, and M. D. Green, for plaintiff in error.

Hayes & McIntosh, J. A. L. Wolfe, and J. H. Wood, for defendant in error.

Opinion by BLEAKMORE, C. This was an action to recover for personal injuries brought by Marcus L. Taylor in the district court of Bryan county, against the Missouri, Kansas & Texas Railway Company. Upon trial to a jury plaintiff obtained a verdict and judgment for $8,750, and defendant has appealed. After the appeal in the original case the railway company filed in the court below a petition for new trial on the ground of newly discovered evidence, which petition was heard and denied, and in due time the company appealed from the ruling of the trial

court in this regard, the cause being styled the same as in the original case and numbered 8364. Thereafter the railway company filed its petition in the court below to vacate the judgment on the ground of fraud. Upon hearing, this petition was also denied, and from this ruling an appeal was perfected to this court, under the same style, number 9137. The three appeals were by order of this court consolidated, and submitted and heard as one case.

In his petition plaintiff alleged:

That on, and for a long time prior to, March 11, 1914, he was in the employ of defendant as rear brakeman on its freight trains. That on that date he was engaged in the performance of his duties as such brakeman on a freight train of defendant bound from Muskogee, Okla., to Parsons, Kan. That "plaintiff was riding in his proper place in the cupola of the caboose attached to said freight train, and as it was approaching the city of Wagoner, in the state of Oklahoma, said train stopped with great, sudden, and unusual force, thereby throwing plaintiff against the front, sides, seats, and constructions then and there situated in said cupola with great force and violence, inflicting upon him serious, painful, and permanent injuries. * * * That the defendant, its servants, agents, and employes, other than plaintiff were then and there guilty of gross carelessness and negligence, causing the sudden stopping of said train and plaintiff's subsequent injuries. * * * That the employes of the defendant operating and propelling the locomotive then and there drawing said train carelessly, recklessly, and negligently applied said brakes, thereby causing the same to stop with great, unusual, and unnecessary suddenness," etc.

Defendant answered by way of general denial, and pleaded assumption of risk and contributory negligence on the part of plaintiff.

At the time of the occurrences in question the parties were engaged in interstate commerce, and the action was instituted and trial under the federal Employers' Liability Act (U. S. Comp. St. 1916, §§ 8657-8665). By the evidence adduced on behalf of plaintiff it appears that on March 11, 1914, he was employed by defendant as rear brakeman upon a freight train composed of an engine and 75 cars, including the caboose, which moved north out of Muskogee, Okla., about 7 o'clock p. m., toward its destination at Parsons, Kan. At Muskogee the employes in charge had received orders to run the train upon a side track at Wagoner to there permit the passing of a south-bound passenger train. When a short distance out of Muskogee plaintiff took his position in the cupola of the caboose. The entire train was equip-

ped with air brakes which could be, and in the instant case were, operated and controlled from the engine by the engineer, and such appliances, so far as the evidence discloses, were in perfect condition. The track leading into Wagoner from the south is down grade for about three-quarters of a mile. As the train approached the siding at this station, without signal from the conductor, it was stopped with a sudden jerk or jar, throwing plaintiff to the floor of the cupola and causing the injuries of which he complains. It was required that the train should come to a stop before entering upon the side track at Wagoner in order to allow the head brakeman to open the switch. From the only testimony relative thereto it appears that where necessary to stop a train on a down grade it was the habit or custom to "bunch the train"; that is, to take up the slack, "to gather the cars together so that when they stop they do not run together with a jar." The only persons in the caboose at the time were the plaintiff, the conductor, and two cattlemen accompanying a shipment of live stock, and their testimony relative to the sudden stoppage of the train and its immediate effects is conflicting in no substantial particular. Plaintiff was in the cupola. The conductor was occupied at a desk near the south end of the caboose. sitting on a bench some 20 feet long. The two stockmen were lying on a bunk, one with his feet toward the north of the caboose, and the other near the south end. When the train stopped, the conductor was thrown from under the desk, along the bench, four or five feet, and his lantern was tossed to the center of the car. One of the stockmen was pushed forward until stopped by his feet coming in contact with the north end of the caboose; the other was thrown some six or eight feet toward the north. All the lights in the caboose were extinguished except the lantern of the conductor which was rolling around on the floor. The conductor stated that the jar was "rather severe". One of the stockmen testified:

"Well, the train stopped; we could feel or at least I could seemingly feel just probably the train slowing—just a little from our speed that we had been going, and all at once, why, it just threw us—threw me and my brother-in-law—he and I were down in the bunk below, and it threw him to the front end of the car entirely up against the front end and it threw me nearly to the front end of the car and I was about the back end of the caboose. * * * As I stated a moment ago, we were going along at a fair rate of speed and we could feel the train slow a little bit. It hadn't slowed much, but just a little bit, and it stopped almost perfectly still and it took such a shock that

it threw us to the front end of the caboose."

Plaintiff was found lying on the floor of the cupola, helpless and unconscious. There was an abrasion of the skin and a little blood on his left temple. He was removed from the train and placed under the care of a doctor at Wagoner. Defendant correctly states in its brief that "there is a direct conflict in the testimony as to the nature and extent of the injuries," suffered by the plaintiff.

At the close of the evidence in behalf of plaintiff a demurrer interposed thereto by defendant was overruled. Thereupon the engineer testified for defendant (we quote excerpts from the brief of defendant as to the substance of his testimony):

"On approaching the siding at Wagoner I had occasion to stop the train as we were to take the siding for No. 3, a south-bound passenger train. My engine was stopped about three or four cars south of the south passing track switch which was the switch we were to go in on. The stop was made in order to permit the brakeman to open the switch. In stopping the train at this switch I made the usual service application of the air. By this I mean a slight reduction of the train line pressure that is necessary to set the brakes. By 'usual' I mean a reduction of the train line pressure of from six to eight pounds. This was what would be used to stop a train of this kind. The engine came to a stop. I did not know of the accident until we had pulled in on the siding clear to the north end and was advised of it by Conductor Gallagher. I made only one application of the air to make the stop. It is not usual to make about three applications of the air. * * * In going down hill if your speed is fast it is necessary to draw off more air, but our speed was not fast enough to require more than the one reduction to stop the train. We were running not over 15 miles an hour with a slight down grade. We had a heavy long train of 70-odd cars. It does not take more reduction of the air for a heavy train moving 15 miles an hour than it does a light train. When going at a certain speed, in the manipulation of the air brakes, the brakes take hold and stop the train. It would have required just about as much braking power to have stopped a train consisting only of engine and caboose as it would have a train consisting of 74 cars, both going at 15 miles an hour. I know what 'bunching a train' means. It is permitting the rear end to run against the engine going a little slower than the rest of the train, and come down gradually, slowly. permitting the rear end to run in. It is right to bunch a train in stopping it on a down grade. In bunching the train you make a reduction and slow your train up a little and then allow the car next to the tender and engine to run up against the tender. and that is what I did. Then the next car would roll

against the preceding cars. You keep the engine going a little slower than the rest of the train and come down gradually, slowly. In this way the slack will run up. They run together so that the slack is taken up, and when the engine stops the train stops easily. Naturally if you stop a long train without bunching it the rear will run up, and the longer the train the more severe and violent the jolt." .

Defendant's trainmaster testified that the following rule of the company was applicable to its division between Muskogee and Parsons:

"Rule No. 410. While it is the duty of the brakeman to ride on top of freight trains, during cold and stormy weather and when all cars in the train are equipped with air, the rear brakeman may ride in the caboose and the forward brakeman on the engine, provided they take their positions at the brakes when descending heavy grades and when within a distance of not less than one mile from each station, railroad crossing, coal chute or water tank, where they will remain until the train comes to a full stop, or has passed the station, crossing, coal chute or tank. Brakemen will take position on high cars, dividing the distance between the engine and caboose as nearly as possible. When the train is to take a siding head brakeman may go to the engine in time to throw switch and rear brakeman will take position on high car as nearly in the center of the train as possible."

This witness also testified that such rule was enforced as far as possible, and that in certain instances he had suspended trainmen for failure to observe the same, but was unable to recall any particular occasion or name of any employe so suspended. The plaintiff testified that such rule was not observed in the operation of defendant's railroad and had not been since some time before defendant's witness had been made trainmaster: that he had worked over the territory since 1906; and that on the road generally it had never been observed, and such fact was known to officials of the road who had authority to enforce the rules.

Defendant argues that the court erred in submitting the case to the jury: (1) Because there was no proof of negligence on the part of the railroad company; (2) that the instructions under which the court submitted the case were abstract and inapplicable; (3) that the court erred in refusing to charge the jury that they could not consider the length and make-up of the train in determining the question of negligence; (4) that there was error in the instruction given touching the question of rules and in refusing to give the instruction requested by defendant relative thereto; and (5) that there was error in instructing the jury that

three-fourths of their number could return a verdict, and in receiving a verdict signed by only 11 of the jurors.

It is insisted that the evidence is insufficient to show primary negligence on the part of defendant, and that:

"The only evidence offered is that there was a jerk or jar of the train incident to the stop, which was made at the switch, and even then there is no evidence that the jar was not such as might ordinarily be experienced in operating a train of this character."

It is urged that the doctrine of res ipsa loquitur, upon which it is contended plaintiff must rely, does not apply in actions between master and servant. It seems to be the rule that:

"The fact of accident carries with it no presumption of negligence on the part of the employer, and it is an affirmative fact for the injured employe to establish that the employer has geen guilty of negligence." Patton v. T. & P. R. Co., 179 U. S. 663, 21 Sup. Ct. 275, 45 L. Ed. 361; M., O. & G. R. Co. v. French. 52 Okla. 222, 152 Pac. 591; St. Louis & S. F. R. Co. v. Snowden. 48 Okla. 115, 149 Pac. 1083.

However, in this regard it seems sufficient to say that while the mere fact of the sudden stoppage of the train accompanied by a violent jar occasioning plaintiff's injuries would not carry with it a presumption of negligence on the part of defendant, and therefore the doctrine of res ipsa loquitur does not obtain, yet plaintiff in this case need not, and indeed does not, invoke such doctrine, but relies on evidence of other facts and circumstances to affirmatively establish that such stop with the resultant injuries was caused by the negligence of the engineer in the careless application of the air brake under his control.

All men are to some degree familiar with the operation of freight trains, and while it is a matter of common knowledge that the stoppage of such trains is attended with more or less jerk or jar, it is equally well known that the usual and ordinary effect of stopping a freight train is not to extinguish the lights in the caboose and throw its occupants with dangerous violence from one portion of the car to another. When the fact of such a stop and the results accompanying it were established, the mere conclusion of a witness testifying to the effect that such stop was violent and unusual was not essential to a finding of the jury that such was the fact.

Jurors are presumed to know what every one else knows. In arriving at a verdict

they are not confined to the mere letter of the evidence, but in applying the testimony, and the reasonable inferences and deductions therefrom, and determining the credibility of witnesses, may properly call to their aid matters of common experience, observation, and general knowledge. If the usual and recognized results of the stopping of a freight train were such as attended the stop in question, it is quite probable that our people would employ less hazardous means of transportation than railways. Although no witness testified thereto in so many words, in the light of common observation and knowledge the jury was warranted in finding from the established physical facts that the jerk and jar occasioned by the sudden stopping of the train in the instant case was unusually and extraordinarily violent. The evidence of plaintiff, which is supplemented and corroborated by that of the engineer, in our opinion amply supports a finding that if the engineer had "bunched" the train, as he testified was proper and right to do in coming to a stop on a grade, the jerk and jar of the caboose causing plaintiff's injuries would not have occurred; and the obvious inference from his failure so to do was sufficient to send the case to the jury on the issue of primary negligence.

"The essential import of the doctrine of 'res ipsa loquitur' in any given case is that on the facts proved plaintiff has, without direct proof of negligence, made out a prima facie case; so that, whether or not the doctrine obtains in a case between master and servant, it need not be invoked where the servant in an action for his injury produces other evidence; that is, if there is any specific evidence, positive or circumstantial, bearing on the question of negligence." Western Steel Car & Foundry Co. v. Cunningham, 158 Ala. 369, 48 South. 109.

In the body of the opinion it is said:

"As was said in the oft-quoted case of Graham v. Badger, 164 Mass. 42, 47, 41 N. E. 61, it is 'merely a short way of saying that, so far as the court can see, the jury, from their experience as men of the world, may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of other explanation, or other evidence which the jury believe, that it happened in consequence of negligence.' And thus is brought out the fact clearly, 'so often overlooked, that it is the jury which makes the presumption in giving proper effect to the evidence, the jury which says res ipsa loquitur.' See 66 Cent. Law J. No. 20, p. 386; Bien v. Unger, 64 N. J. Law, 596, 46 Atl. 593. Therefore, where the servant (plaintiff) produces

other evidence than the mere fact of the accident—in other words, if there is any specific evidence, positive or circumstantial, bearing on the question of negligence, which will warrant a reasonable inference of negligence—there is no necessity for the invocation of the doctrine of res ipsa loquitur in aid of, or to establish, a prima facie case. This is clearly illustrated in a case, decided by the Missouri court, in which an employe was injured by the falling of a bridge. We quote: 'Where all the details of the construction of a bridge and its inspection are before the jury, the case of a servant who is injured by the fall of the bridge does not stand merely on the fact that the structure gave way, and it is not error to leave the jury to say whether the defendant's want of reasonable care in the erection and inspection of the bridge occasioned the injury complained of.' Bowen v. Chicago, etc., Co., 95 Mo. 268, 8 S. W. 230."

See, also, T. & P. Ry. Co. v. Putnam, 120 Fed. 755, 57 C. C. A. 58.

In the petition it is set forth that the loaded and empty cars composing the train were not properly distributed with reference to safety and the proper application of the braking power. Evidence was adduced as to the number and location of such cars, but no testimony was offered or contention made that they were improperly placed in the train or that their situation in any manner affected the safety of the train, or the braking power; and in submitting the issues to the jury the trial court refrained from referring to such allegation. However, as to this phase of the case defendant requested the following instructions, which were refused:

"The court instructs you that in determining the question of negligence on the part of the railway company you should not consider the length of the train.

"The court instructs you that in determining the question of negligence on the part of the railway company you should not consider the arrangement of the loaded and empty cars in the train."

We are of opinion that the court correctly declined to give either of such instructions. As to the first, in the light of the engineer's testimony that, "naturally if you stop a long train without bunching it the rear will run up and the longer the train the more severe the jolt,' the jury should properly have considered the length of the train. The second was clearly without the issues of fact presented by the evidence, and upon a theory of negligence wholly abandoned by the plaintiff upon the trial. It is a familiar rule that the court should state to the jury only

issues joined by the pleadings upon which some testimony has been offered.

"The scope of an instruction in a particular case is to be determined. not alone by the pleadings therein, but also by the evidence in support of the issues between the parties, and, even though an issue is raised by the pleadings, it is not proper to give an instruction thereon although it may be abstractly correct, where there is no basis for it in the evidence." 14 R. C. L. 786.

"It is not error to refuse an instruction, based upon a state of facts. to support which there is no evidence." Shuler v. Collins, 40 Okla. 126, 126 Pac. 752.

Regarding the rule of defendant above set forth, plaintiff's obligation to observe it, and the testimony as to the general disregard of it by employes with the knowledge of the company, the court charged the jury:

"It was the duty of plaintiff to use reasonable and ordinary care to observe the rules promulgated by the company for the conduct of its employes; and if you find in this case that he negligently disobeyed such rules and. that such disobedience contributed to his injury, then he would be guilty of contributory negligence, and if you should find that defendant is liable, the amount which he is otherwise entitled to recover should be reduced as stated in instruction No. 7. It is within the power of defendant, however, to waive the observance of its rules on the part of its employes, but before you would be warranted in finding that it had waived the observance of the rules in this case you must find that there was a uniform disregard thereof by the employes, and that such disregard and failure to obey was known to the officers of the company."

It is urged that the court committed prejudicial error in giving such instructions and in refusing the following requested instruction touching this feature of the case, viz.:

"You are instructed that it was the duty of plaintiff to observe the rules of the company with reference to the place where he should be stationed on the train on approaching a station if you find from the evidence that defendant has a rule upon that subject.

"If you find from the evidence that there was a rule in force requiring the defendant Taylor to be on top of the train on approaching the station of Wagoner, and that he violated such rule and would not have received the injuries complained of if he had observed same, your verdict should be for the railway company."

The charge that plaintiff was obliged only to use reasonable and ordinary care to observe the rule in question was erroneous, for the reason that the duty of a railway employe to obey reasonable rules adopted and promulgated by the company manifestly cannot be measured by the variant requirements of ordinary care; but inasmuch as it does not directly appear and cannot properly be inferred from the evidence that the violation of such rule caused or contributed to plaintiff's injury, we are of opinion the giving of such instruction and the refusal of the one requested did not prejudice the rights of defendant. The general rule is that:

"Where the injury is not caused by an act done in disobedience of the rules of the company, but is caused by a negligent breach of duty by the company, with which the violation of the rules has no proximate connection, the employe may recover, although he may have violated the rules." Elliott on Railways, § 1282.

It was not error to instruct the jury that three-fourths of their number might return a verdict, and in receiving a verdict signed by 11 of the jurors. St. L. & S. F. R. Co. v. Brown, 45 Okla. 143, 144 Pac. 1075.

On the original trial, which occurred more than a year after the accident, plaintiff testified that when he returned to consciousness after the injury he was unable to move any part of his body except the head, but within a day or two regained control of his hands and arms, and gradually obtained the use thereof; that there was no sensation in his legs, feet, and toes, and he was without power to use them normally; that the lower portion of his body from the navel downward was cold; that he suffered greatly from pain in the head and the neck between the shoulders, the pain being more intense at times; that some three weeks after the injury he commenced and had continued to use an invalid's chair; that in the interval between his injury and the trial, he had, among other occupations, been employed as a salesman and demonstrator of automobiles, running a car the operation of which required the use of his feet upon the starting device, and the clutch and brake pedals; that by the use of his hands upon his limbs he was enabled to exert the necessary pressure on these parts of the machine; that the conductor in charge of the train at the time of his injury was one of those who had ridden with him. and observed his demonstration of the automobiles; that having attained an upright position and properly placing his feet he could stand without assistance; that with the aid of crutches and a harness which he had devised, he could walk lifting his feet by a movement of the shoulders; that from his experience he believed he could so walk. not quite the length of a city block. He attributed his improvement in the last 10

months to the fact that he had learned to handle himself, and become accustomed to "the feeling of not touching anything."

Two expert witnesses (osteopaths) testified that in their opinion plaintiff was suffering from a dislocation or twisting of the fifth dorsal vertebra, causing a loss of sensation below the navel and paralysis of the lower limbs, and that such condition was permanent.

Another expert, a physician, testified to his examination of plaintiff, saying that there was no test recognized as infallible in determining whether or not a person was paralyzed, and stating:

"My opinion is that he will some time in the future be able to move his legs a little, but never be able to walk like he did. Q. Your idea is that he may improve, but he will never be able to walk? A. No, sir."

Another physician, who had made a skiagraph of plaintiff's body, testified that he found therefrom an injury to the fourth dorsal vertebra, and concluded that he could not walk.

On behalf of defendant, Dr. Jobe testified that he examined plaintiff half an hour after his injury in the depot at Wagoner, and found him apparently unconscious; examined his spine as thoroughly as might be, but found none of the usual manifestations of injury to the spine; diagnosed his case as one of mere concussion, not demanding medical treatment but requiring absolute quiet and rest; found no evidence of shock; stated that radiograph of plaintiff's spine indicated no abnormal condition.

Dr. Creel, local surgeon for the Missouri, Kansas & Texas Hospital at Parsons, Kan., testified that he saw plaintiff on March 14, 1914, and made an examination of his spine, and found nothing out of the normal, no deformity, evidence of fracture, rotation or dislocation; that he made further examinations in the latter part of March, in May, June, and September, and (quoting from defendant's brief):

"On June 30th I made another careful examination and outlined the area of anaesthesia as he complained of and found at that time the point below the ninth dorsal, going up to a region a little below the navel and on the right side down to the crest of the ilium. He complained of no painful sensation to a pin prick on the limbs but the muscles were not atrophied, that is, dwindled or lessened in size. We could always note some change in the area of the anaesthesia. In order to bring about paralysis of the legs there would have to be a transverse lesion of the spinal cord at some point along the spine. By lesion is meant a tearing or rupture of the parts. Had there been such there would not have been any change in the area of anaesthesia. From my examination of Mr. Taylor I could not find anything to sustain a complete paralysis of the lower limbs. From an examination of the X-ray plate made by Dr. Moore I do not find any evidence of fracture, dislocation, or rotation of any of the dorsal vertebrae or any thing to show them out of position. I do not find anything showing any exudation or excretions of callus around the vertebrae."

On the hearing of the petition for a new trial and of the petition to vacate the judgment, much evidence, conflicting to a certain extent, was adduced relative to plaintiff's physical condition and ability to walk after the judgment in the original case. Even to epitomize such evidence would extend this opinion to an unusual length; and it appears sufficient to say that the effect of such evidence of occurrences subsequent to the trial was to establish that plaintiff's condition had improved; he was shown to be able to stand erect for a short time and to take a few steps without artificial support; he now can walk with the use of a cane, lifting his feet by a movement of the entire body, with the legs "spraddled"; but that he is still a cripple and probably will never regain the power to walk normally.

On behalf of defendant it is urged that the evidence of occurrences subsequent to the trial proper disproved the ground upon which recovery was had, in that it shows the expert diagnosis and prognosis of plaintiff's bodily condition as testified to by the physicians, and upon which the jury obviously relied in arriving at the verdict, to have been wholly incorrect; that in the light of such evidence it was properly supposed by the jury that plaintiff was permanently paralyzed and would never be able to walk, whereas it now appears that he was not so paralyzed and can walk. It is also contended that the subsequent events in evidence conclusively showed that plaintiff simulated paralysis and thereby deceived the jury, and that although the expert witnesses may have been honestly mistaken in their testimony, yet their evidence was as prejudicially effective in perpetrating a fraud upon the defendant and the court as if they had deliberately perjured themselves.

We have not found where the precise questions presented by these contentions have been considered by this court; but in other jurisdictions new trials have been granted in personal injury cases where, after judgment,

there have been occurrences showing that the verdict was founded on mistaken testimony, in that the bodily condition of the plaintiff was in fact entirely different from what it was supposed to be by the jury, and that the changed condition after the trial was totally inconsistent with the prediction given at the trial as to what it would be; or, where plaintiff's improvement or recovery soon after the trial was so extraordinary as to raise the necessary inference of simulation or malingering on his part, and the falsity of his testimony as to the character and extent of his injuries. Illustrative cases are Anshutz v. Louisville R. Co., 152 Ky. 741, 154 S. W. 13, 45 L. R. A. (N. S.) 87, wherein it is announced:

"A new trial may be granted of an action by a woman for personal injuries, where the verdict was based on mistaken testimony of medical experts that an operation necessitated by the injury had rendered her barren, and that the child which was developing at the time of trial was a tumor, which would necessitate another operation, endangering her life, where the statute permits a new trial for newly discovered evidence"

—and Southard v. Bangor & A. R. Co., 112 Me. 227, 91 Atl. 948, L. R. A. 1915B, 243, in which it is held:

"A new trial of an action to recover damages for personal injuries in which the damages were assessed on testimony to the effect that plaintiff was physically wrecked and able to do but little, if any, manual labor, may be granted for newly discovered evidence that soon after the trial he went on a hunting trip, engaged in heavy work, and danced."

If in the instant proceedings we apply the rules governing the granting or refusal of new trials on the ground of newly discovered evidence to happenings subsequent to the trial or should we think such rules inapplicable, but hold that the inherent power of the court may be invoked in a proper case on such ground to grant a new trial in order that justice may be done, yet, in either case, the granting or refusal of a new trial, as in all other cases, is a matter largely within the judicial discretion of the trial court and, unless it appears that there has been a prejudicial abuse of such discretion, the ruling of the court should not be disturbed on appeal.

In Vickers v. Phillip Carey Co., 49 Okla. 231, 151 Pac. 1023, L. R. A. 1916C, 1155, it is held:

"While the statute provides (section 5037, Rev. Laws 1910) that where the grounds for a new trial could not with reasonable diligence have been discovered before, but are discovered after the term at which the verdict is rendered, the application for a new trial may be made by petition filed in the original case, not later than the second term after the discovery, and in no event later than one year after final judgment was rendered, yet, where the ground of the petition is newly discovered evidence such applications are as a general rule viewed with disfavor by the courts."

"A rule of wide recognition regarding the granting of new trials on the ground of 'newly discovered evidence' exacts that the evidence fulfill the following requirements: (1) It must be such as will probably change the result if a new trial be granted; (2) it must have been discovered since the trial; (3) it must be such as could not have been discovered before the trial by the exercise of due diligence; (4) it must be material to the issue; (5) it must not be merely cumulative to the former evidence; (6) it must not be to merely impeach or contradict the former evidence."

"New trials for newly discovered evidence, not material on the main issues but only on the measure of liquidated damages, have been refused frequently. Proposed evidence to reduce the amount of the recovery only must be of so convincing a character that had it been offered at the trial, the verdict would be clearly excessive." 29 Cyc. 904, and cases cited.

In Ellis v. City of Hammond, 157 Ind. 267, 61 N. E. 565, it is held:

"In an action for injuries received from a defective sidewalk, a new trial for newly discovered evidence will not be granted plaintiff where such evidence consisted of testimony of physicians as to the character of the injuries, bearing only on the amount of damages, and which could not affect the finding on the alleged cause of action."

For reversal of the action of the trial court refusing to vacate the judgment on the ground of fraud, defendant relies on the case of El Reno Mut. Fire Ins. Co. v. Sutton, 41 Okla. 297, 137 Pac. 700, 50 L. R. A. (N. S.) 1064, wherein it is held:

"Before a court of equity will interfere with a judgment rendered on perjured testimony, and order a new trial, it must be made to appear that the injured party has used due diligence in presenting the matter to the court, and that he is clearly entitled to the relief sought; that the question presented has never been litigated in any court on account of the perjury complained of, and that but for the perjury the question raised would have been fully presented and adjudicated at the former trial; that the question of perjury complained of could not have been litigated at the former trial by the use of due diligence. * * *"

Even if we concede, for our present purpose, that the rule announced in that deci-

sion is good law, it has no application to the case before us.

The evidence offered upon the original trial as to the nature and extent of plaintiff's injuries, including the fact that since their infliction his condition had in some respects changed for the better, and the probability of future improvement was clearly within the issue upon the question of damages. On several occasions before the trial he had been examined by one of the regular railway hospital surgeons, obviously for the purpose of ascertaining whether he was injured as he claimed. This surgeon was a witness for defendant, and while neither he nor the other expert produced in its behalf testified in so many words that plaintiff was not suffering from paralysis, yet they did state that from a thorough examination of his body they could find nothing to sustain complete paralysis of the lower limbs, and that the X-ray plate of his spine failed to disclose any evidence of dislocation or rotation of the dorsal vertebrae, or show them to be out of position. Relative to this phase of the case defendant states in its brief:

"In the case at bar the railway company offered no evidence that Taylor was totally and permanently paralyzed. It is true that two physicians testified on behalf of the railway company, but the testimony of one of them was directed entirely to first-aid treatment, and examination given Taylor very shortly after the accident at Wagoner, before he had been removed to his home at Parsons, and the other was the testimony of the company physician who had examined him at Parsons, but it will be observed that these physicians nowhere in their testimony expressed any opinion contradictory of those given by the physicians testifying for the plaintiff, touching the extent and permanency of the alleged paralysis, and the question which is now before the court was not litigated in the original trial. The railway company, like the insurance company in the above-quoted case, defended upon a different theory, namely, that it was not guilty of any negligence causing the injury, and that there could be no liability regardless of the extent of the injury."

Defendant admits that it did not introduce the testimony of its expert witnesses for the purpose of contradicting the evidence adduced by plaintiff as to the character and extent of his injuries, or in any effort to minimize his damages (although this issue was squarely presented), but voluntarily failed to defend in that respect on account of the fact that it expected to prevail upon the trial on the theory that it was not guilty of negligence in causing his injuries. If, as contended, the question of the extent of plaintiff's injuries was not litigated on the original trial, it is clear that defendant alone is responsible therefor by refusing to meet the issue in that regard, of which it was fully apprised, because of overconfidence in its ability to obtain a favorable verdict on the question of negligence. Under such circumstances it would seem that defendant is not in a position to present and urge such defense for the first time by petition for new trial or to vacate the judgment.

In Hobbs v. Smith, 27 Okla. 830, 115 Pac. 347, 34 L. R. A. (N. S.) 697, it is said;

"A party is entitled to have his day in court; both parties are entitled to this, but neither party is entitled to have more than one fair, reasonable opportunity to establish his claim or defense. To allow more would be to protract litigation to the extent which would preclude the administration of justice."

See also, St. Louis & S. F. R. Co. v. Hardy, 45 Okla. 523, 146 Pac. 38.

The newly discovered evidence discloses no fact or occurrence subsequent to the trial in any way concerning plaintiff's cause of action on account of the negligence of defendant, but in its strongest aspect could affect merely the amount which he is entitled to recover; in other words, its only tendency, upon a new trial, might be to mitigate the damages. The evidence upon the trial proper relative to the nature and extent of plaintiff's injuries and the prognosis of his bodily condition are to a degree conflicting, and we may properly assume that the jury, in fixing the measure of his damages, considered the probability of improvement in his condition. Plaintiff at the time of his injuries was a man 32 years of age, earning $100 a month, and considering the evidence relative to his injuries adduced upon the original trial and the subsequent hearings, we do not regard the award of damages as excessive, and are not prepared to say that a new trial of the only question upon which another trial could be had, viz., the amount of the recovery, would materially change the result. We are of opinion that the record does not disclose any prejudicial abuse of discretion by the trial court in refusing to grant a new trial or to vacate the judgment.

There being no error shown upon the trial proper, the judgment should be affirmed, and no abuse of discretion appearing in the refusal to grant a new trial or vacate the judgment, the rulings of the court below in these respects should be affirmed.

By the Court: It is so ordered.