KNUTE BAKKEN, Appellant, v. STATE OF NORTH DAKOTA, Doing Business as North Dakota Mill and Elevator Association, Respondent.

(234 N. W. 513.)

Opinion filed Jan. 16, 1931.

*L. J. Palda, C. E. Brace* and *Robert W. Palda,* for appellant.

*James Morris,* Attorney General, and *Charles Simon,* Assistant Attorney General, for respondent.

346

BIRDZELL, J. The plaintiff brought action against the defendant to recover damages for personal injuries alleged to have been sustained on December 22, 1920, as a result of heavy sacks containing mill products having fallen upon the plaintiff in the warehouse of the defendant's mill at Drake, North Dakota, in circumstances which will be stated below. Upon the trial the plaintiff had judgment for $12,000 damages and costs. The defendant moved for judgment non obstante, which motion was granted, and the plaintiff appeals. The case has heretofore been before this court upon a demurrer to the complaint in which the liability of the defendant for alleged negligence in connection with the operation of its business was determined. See Bakken v. State, 56 N. D. 861, 219 N. W. 834. Upon the trial the following facts were developed:

The plaintiff, prior to the employment in connection with which he sustained the injuries complained of, had worked as a section laborer upon the railroad, had done occasional work at the defendant's flour mill unloading cars of coal and worked upon farms during threshing, and the like. A couple of days before the accident in question, the plaintiff, not having steady work, appeared at the defendant's mill early in the morning and inquired of the manager if there was a carload of coal to unload. The manager informed him that there wasn't but that if he would stay at the mill there would be some work for him, as some men were expected there who would need help. The manager anticipated at the time that the work of auditing the mill under the direction of the state board of auditors would be immediately undertaken. He did not hire the plaintiff, but later the latter went to work

in the warehouse. The warehouse consisted of two large rooms, a north and a south room, separated by a partition. The south room was almost filled with sacks of mill products, which the auditors desired to count. The audit was made by the Bishop Brisman Company under the supervison of one Livdahl. Livdahl hired the men to help in the warehouse, bossed the job and paid them. At the time of the accident in question, the plaintiff was engaged in loading sacks of mill products on a truck to be moved from the south to the north room of the warehouse. He received no specific directions as to the method of removing the sacks. The room in which he worked was about 20 by 30 feet by 16 feet high. The sacks were piled in tiers reaching almost to the ceiling. The plaintiff's job was to load hand trucks for other men who trucked the sacks into the adjoining room. It appears that in performing his work the plaintiff removed two adjoining tiers of sacks making a sort of channel running through the warehouse. When nearly all the sacks were removed from these two tiers and while the plaintiff was working in the channel thus created, sacks came down from above falling upon and injuring him.

The complaint alleges that the plaintiff was employed under the direction of the state board of auditors and the negligence charged against the defendant is that the defendant had theretofore in and about the conduct of its milling operations "negligently, wantonly, and in total disregard of the safety and security of those who might lawfully be in such storage room, piled in a storage room used in connection with the conduct and operation of said mill, certain sacks of flour and bran, in sacks weighing from 100 to 140 pounds each, in large piles consisting of perpendicular columns or stacks, from 12 to 16 feet high, without binding each such column or stack to those contiguous thereto, in any manner, so as to prevent the falling of such sacks upon slight disturbance; and that no one could from observation alone discern or determine that such sacks were so piled in a negligent manner, or that said columns or stacks of sacks were so liable to fall on slight disturbance."

Negligence is also predicated upon the knowledge of the defendant that the sacks were negligently piled, rendering the warehouse a dangerous place in which to work among the columns of sacks, and the failure of the defendant to warn the plaintiff of the danger. He pleads

no knowledge of the dangerous condition; that such condition could not be readily ascertained by observation and that the defendant had knowledge that the plaintiff was wholly unaccustomed to such labor. It is stipulated the plaintiff was not hired by the defendant. The testimony with reference to the exact manner in which the work of the plaintiff was being done may be briefly summarized as follows:

The witness Schmidgall, who was hired in the same manner as the plaintiff and who testified on his behalf, testified on cross-examination that the accident occurred when the plaintiff was removing the last sacks from the second tier; that as he took these sacks out there were tiers on either side of him extending to the top. When asked if he knew any reason why the sacks the plaintiff removed just prior to the time of this accident should have been removed rather than those that were located higher up, he said: "Why we were working under the orders of our boss (referring to Livdahl). He was doing the paying, and he done the saying; and that was what we were following. That was our orders to remove them in that manner. Question. Who directed you to remove them in that manner? Answer. It was one of the Bishop-Brisman men. There were three fellows there; I couldn't say which one of the three, but it was one of them that directed us to do that. Question. To take them out in the manner that you did? Answer. Yes."

The plaintiff testified that prior to the accident two tiers had been removed excepting only two or three sacks that were left; that he had no idea that the sacks would be apt to fall; that he had never done this character of work before, that Livdahl told him to go in the warehouse and help load sacks; that he was just taking the sacks that he was told to take. Livdahl told him what rows or tiers to take down and he followed Livdahl's instructions. He couldn't say for sure whether there were tiers standing on both the east and west sides of him at the time he was hurt, but knew there was a tier on the west side about 16 feet high. When asked specifically as to directions received from Livdahl he testified as follows: "Question. And you may have taken some of those sacks down there that Livdahl didn't tell you to take? Answer. No, he just pointed to those rows that we should take out. Question. He pointed to that pile on the south side? Answer. Yes, pointed to those rows, 'And go south clear through,' he says, and we did."

Hibbard, the manager of the mill, testified he paid no attention to the men that were engaged in the auditing business and that no one under his direction or control paid the men that were engaged in that work. He testified he went to the warehouse immediately after the plaintiff had been injured saying that "they (referring to the crew working for the auditors) had channeled a space two tiers wide through the house toward the wall, and they nearly finished, apparently, the second tier. Whether or not they were taking two tiers at a time, I don't know but at this time it appeared there were a few sacks,—it was hard to tell how many,—left in the second tier at least, of the two that were being taken out. That was hard to tell exactly, because there were some sacks that had fallen off from an adjoining pile that were more or less mixed in with those that were apparently left remaining in the pile;" that there were sacks on either side of the channel; that it extended entirely to the wall except a few sacks that lay in the bottom that were yet to be removed. His memory was that the sacks that fell were from the west tier. They were bran sacks. The other testimony is to the effect that this store room was almost full of mill products; that the work was being done near a door in the east end of the room and consequently that the bulk of the material stored in the room was piled to the west of where the plaintiff was working. The sacks were piled from the east to the west and the tiers ran north and south.

Hibbard further testified concerning the manner in which these products had been stored in the warehouse, to the effect that the sacks were placed in the storeroom under his direction; that there is a standard method for piling and storing sacks of that character, which method he described. He described in detail the standard method of piling the sacks of different sizes and containing different products, showing that flour and shorts were piled in much the same way but that in piling bran a different method had to be used because the bags were filled under a pressure which made the product dense in the package. He said it was impossible to pile sacks of bran and make them stand crisscross since they are too round and too hard; that consequently they were piled one on top of the other. He said because a bran bag is so hard it would be dangerous to build them up perpendicularly to any great height but that they are not dangerous if they are properly built. He further testified that the sacks in the storeroom

in question were piled according to the standard method. There were at least three different sizes of sacks. There were 98 pound and 140 pound sacks of flour and 100 pound sacks of bran. Each tier would contain sacks of only one kind. He was asked: "You know then, Mr. Hibbard, that they were stored there in the manner that you have indicated?" and he answered: "Yes; yes, I believe they were stored right, because each tier, as it was placed in the warehouse, it took about a day to put in a tier. It was my custom to go into the warehouse and examine the work done by the boys who were doing the work, that is, in the warehouse, and to my knowledge there never was a tier of the produce that went in the warehouse when they were going in, that I didn't make a personal inspection of the work done. . . ."

August Wiegelt, who was employed by the manager of the mill, had assisted in storing the flour and bran in the storeroom. He testified that Hibbard, the manager, told him he should pile the sacks higher "and straighten them out and so on." When asked if he had worked in the south storeroom while bran and flour were stored there, he said: "Well, I think before just when it was too full. I worked—I and my son, we hoisted them up with a block and tackle; we had to pile them so high Mr. Hibbard was blockaded; the house was full. . . . Question. And you helped put the sacks in this storeroom? Answer. Yes, they were in just as we took them in here and piled them higher. Question. To make more room? Answer. Yes, to make more room; to make the rows shorter." He testified that he was working in the storeroom at the time Bakken was hurt. He and another man were "straightening out the bakery flour so they could count the rows." This was on the north side of the same room in which the plaintiff was hurt while working near the south wall.

A practice question is raised on the appeal which, in view of our conclusions on the merits, we find it unnecessary to discuss. The vital question is the sufficiency of the evidence to support the verdict of the jury.

We think it may be reasonably inferred from the evidence summarized above that sacks which are properly piled will not fall; that the standard method of piling is employed to the end that sacks of a given product may be removed from any tier containing them exclusively, in filling orders and the like, without reference to the adjoin-

ing tiers. In other words, that each tier is independently piled and is not dependent for its support upon the adjoining tiers. It is also shown that they were piled under the supervision of the defendant's manager and that the plaintiff had nothing to do with the work of piling them in the warehouse; that he went to work there with the knowledge of the defendant and with no special instructions or warning as to any danger incident to any method to be followed in removing the tiers. The audit was required by law. The defendant is liable as a private or corporate owner to the extent of the capital devoted to the enterprise and owed the same duty to those engaged in the work. Bakken v. State, 56 N. D. 861, 219 N. W. 834, supra.

The appellant contends that in view of the evidence, taken with its reasonable inferences, the jury could properly find that the defendant was negligent in the respects alleged in the complaint. As against this contention the defendant asserts that the evidence positively shows that due care was exercised in the piling of the sacks; that their falling, or the happening of the accident, does not constitute any evidence of negligence; that if there was any negligence the plaintiff was guilty of contributory negligence and that as he was the author of the dangerous condition created and in which he continued to work it was an obvious condition the risk of which was necessarily assumed by him.

It will serve no useful purpose to review at any length the authorities cited pro and con on these propositions. Every case of this character is necessarily dependent upon its own facts. We have set forth sufficient evidence to show the basis for the conclusion at which we arrive and upon which the correctness of that conclusion must necessarily depend. We are of the opinion that the evidence reasonably justified the jury in finding that the accident was such as would not have happened except in consequence of negligence of the defendant in piling the sacks, or that if it resulted from an inherent danger in the method employed to remove tiers, assuming them to have been properly piled, it was a danger which, in view of his known inexperience, the plaintiff had a right to be warned against, and there was negligence in not so warning him.

The case, in so far as it may depend upon negligence in piling the sacks, in our opinion, falls within the principle of res ipsa loquitur. The evidence of the occurrence was sufficient to give rise to a pre-

sumption of fact for the consideration of the jury. See Graham v. Badger, 164 Mass. 42, 41 N. E. 61. In light of the presumption supplied by the principle of res ipsa loquitur, the case is not one where the court can say that reasonable minds must necessarily conclude that the accident was not due to the defendant's negligence.

The law which permits the thing itself to speak and, speaking, to furnish a presumption of fact tending to support the plaintiff's allegations of negligence, is founded upon sound reason. That which speaks is under the control or management of the defendant and is an occurrence such as would not happen in the ordinary course if proper care had been used to avoid it or render it impossible of happening. 1 Sherman & Redf. Neg. 6th ed. page 132. Therefore, the happening of the accident tends to prove the lack of such care as the law requires of him who owes a duty to the plaintiff. In the instant case there is no evidence that the plaintiff disturbed the pile from which the sacks fell. They fell, but they would not have fallen had the tier been properly piled. This was a work which was done by the defendant and under the immediate supervision of the manager. Hence, their falling affords evidence of the defendant's negligence. For authorities supporting our conclusions, see 59 A.L.R. 468, note; Michener v. Hutton, 203 Cal. 604, 59 A.L.R. 480, 265 Pac. 238.

On the other hand, if a different view of the record be taken—one which we believe does not represent a fair interpretation of the evidence—and if it be assumed that tiers properly piled are not self-sustaining and that they should be removed in a certain order so that each one should receive a degree of lateral support from the adjoining tier, the record before us contains ample evidence that no instructions were given by the defendant's manager which would safeguard the workmen against injuries to be reasonably anticipated if a given method were not followed. In this view of the record there is ample evidence of a duty to warn and a failure to observe it.

It follows from what has been said that the order of the trial court granting the motion for judgment non obstante is erroneous and it is reversed, and the cause is remanded with directions to enter judgment on the verdict.

CHRISTIANSON, Ch. J., and BURR, BURKE, and NUESSLE, JJ., concur.