EMERSON, RESPONDENT, *v.* BUTTE ELECTRIC RY. CO., APPELLANT.

(No. 3,195.)

(Submitted November 27, 1912. Decided December 7, 1912.)

[129 Pac. 319.]

*Personal Injuries—Street Railways—Passengers—Complaint— Sufficiency—Joinder of Parties—Evidence—Res Gestae—Expert Witnesses—Excessive Verdicts.*

Personal Injuries—Street Railways—Passengers—Complaint—Sufficiency.
1. The complaint in an action by a passenger on a street-car for damages for personal injuries, which alleged that the injuries were caused by the derailment of the car through the carelessness and negligence of the defendant company and its superintendent, was sufficient; a passenger need not allege the particular cause of the accident.

Same—Joinder of Parties Defendant.
2. A street-car company and its superintendent *held* properly joined as defendants in an action for personal injuries by a passenger.

Same—Evidence—*Res Gestae.*
3. Evidence showing how many people were in the street-car, the derailment of which caused plaintiff's injuries, and where they were sitting or standing, was properly admitted as part of the *res gestae.*

Same—Cross-examination—Expert Witnesses—Physicians.
4. *Held,* that the trial court did not abuse its discretion in permitting counsel for plaintiff to read to a physician, on cross-examination, an excerpt from a medical work, and asking him whether he agreed with the statement therein made.

Same—Negligence—Weight of Evidence for Jury.
5. The weight of the evidence whether defendants were negligent was for the jury to determine; they are not obliged to credit evidence, even though uncontradicted, or give it the weight contended for by counsel.

Same—Excessive Verdict—New Trial.
6. Verdict for $2,750 for injuries sustained by plaintiff in being thrown against the knee of a passenger in the car in which he was riding at the time it was derailed, *held* so excessive as to show passion and prejudice, and new trial granted.

*Appeal from District Court, Silver Bow County; J. J. Lynch, Judge.*

ACTION by J. P. Emerson against the Butte Electric Railway Company and J. R. Wharton. From a judgment in favor of plaintiff the railway company appeals. Reversed and remanded.

*Messrs. Geo. F. Shelton, Peter Breen, Fred J. Furman,* and *A. J. Verheyden,* for Appellant, submitted a brief; *Messrs. Shelton* and *Breen* argued the cause orally.

In view of *Hagerty* v. *Montana O. P. Co.,* 38 Mont. 69, 25 L. R. A., n. s., 356, 98 Pac. 643, and the authorities cited therein, the allegations of the complaint are insufficient to constitute a joint liability; and the court erred in overruling defendants' demurrer to the complaint and in overruling defendants' objection to the introduction of any testimony on behalf of the plaintiff, for the reason that the complaint did not state a cause of action. (*Parsons* v. *Winchell,* 5 Cush. (Mass.) 592, 52 Am. Dec. 745; *Mulchey* v. *Methodist Religious Society,* 125 Mass. 489; *Bailey* v. *Bussing,* 37 Conn. 351; *Campbell* v. *Portland Sugar Co.,* 62 Me. 552, 16 Am. Rep. 503; *Clark* v. *Fry,* 8 Ohio St. 358, 72 Am. Dec. 590; *Berghoff Brewing Co.* v. *Przbylski,* 82 Ill. App. 361; *Warax* v. *C. N. O. & T. P. Ry. Co.,* 72 Fed. 642.) There is no averment of the defendants' negligence sufficient to inform the defendants of what omission of duty they are charged or the causal relation to the injury. (*Allen* v. *Bear Creek Coal Co.,* 43 Mont. 269, 115 Pac. 673.)

Plaintiff's counsel, cross-examining Dr. Horst, read a long extract from a medical authority, ostensibly as a form of question, but palpably to get the statement of a medical writer as primary evidence before the jury. This was improper and inadmissible evidence. (*Ashworth* v. *Kittridge,* 12 Cush. (Mass.) 195, 59 Am. Dec. 178; *Washburn* v. *Cudihy,* 8 Gray (Mass.), 431; *People* v. *Hall,* 48 Mich. 490, 42 Am. Rep. 477, 12 N. W. 665; *Huffman* v. *Click,* 77 N. C. 56; *Byers* v. *Railroad,* 94 Tenn. 350, 29 S. W. 129; *Boyle* v. *State,* 57 Wis. 480, 46 Am. Rep. 41, 15 N. W. 827; *Epps* v. *State,* 102 Ind. 539, 1 N. E. 491; *Whiton*

v. *Insurance Co.*, 109 Mass. 24; *People* v. *Goldenson*, 76 Cal. 328, 19 Pac. 161; *Tucker* v. *Donald*, 60 Miss. 460, 45 Am. Rep. 416.) Section 7940 of our statutes cannot reasonably be said to contemplate the reading of such treatises, in view of *Gallagher* v. *Market Street Ry. Co.*, 67 Cal. 13, 56 Am. Rep. 713, 6 Pac. 869. (See, also, *Union Pacific Ry. Co.* v. *Yates*, 79 Fed. 584, 25 C. C. A. 103, 40 L. R. A. 553; *Ware* v. *Ware*, 8 Me. 42; *State* v. *Baldwin*, 36 Kan. 1, 12 Pac. 18; *State* v. *O'Brien*, 7 R. I. 336.)

*Messrs. Alexander Mackel*, and *William Meyer*, submitted a brief for Respondent; *Mr. Meyer* argued the cause orally.

It is recognized by a great number of authorities to be proper cross-examination to refer to books of authority upon the subject under discussion, and the ability of witnesses may be tested during their cross-examination, by counsel reading from medical books. (*Hess* v. *Owry*, 122 Ind. 225, 17 Am. St. Rep. 355, 7 L. R. A. 90, 23 N. E. 156; *Clukey* v. *Seattle E. Co.*, 27 Wash. 70, 67 Pac. 379.) The question asked the witness was, under the above authorities, clearly competent and proper. It tended to test the knowledge of the witness, and we can find no authority to the contrary. In *State* v. *Hoyt*, 46 Conn. 337, the supreme court of Connecticut held the medical books were admissible in evidence. To the same effect, see *Bowman* v. *Woods*, 1 G. Greene (Iowa), 441; *Merkle* v. *State*, 37 Ala. 139; *Bales* v. *State*, 63 Ala. 30; *Stoudenmeier* v. *Williamson*, 29 Ala. 558. In *Luning* v. *State*, 2 Pinn. (Wis.) 215, 52 Am. Dec. 153, it was held "to be discretionary with the trial judge whether or not counsel shall be allowed in this argument to read to the jury medical or scientific works." "A technical medical question asked an expert witness, in which the language of a standard medical authority is substantially repeated, is not thereby rendered objectionable." (*Tompkins* v. *West*, 56 Conn. 478, 16 Atl. 237.) "A scientific witness may refresh his recollection by referring to standard authorities prepared by persons of acknowledged ability." (*Huffman* v. *Click*, 77 N. C. 55.) "Medical authorities or books proved to be standard with the profession may be used in evidence." (*Carter* v. *State*, 2 Ind. 617; *State* v. *Gil-*

*lick,* 10 Iowa, 98; *Brodhead* v. *Wiltse,* 35 Iowa, 429; *Quacken-bush* v. *Chicago N. W. Ry. Co.,* 73 Iowa, 458, 35 N. W. 523; *Hutchinson* v. *State,* 19 Neb. 262, 27 N. W. 113.)   The question of expert witnesses testifying with reference to medical books has been considered by this court heretofore and such cross-examinations was held perfectly proper.   (*State* v. *Penna,* 35 Mont. 535, 90 Pac. 787.)

To say that based upon the testimony in this case a verdict of $2,750 is so excessive as to indicate prejudice or passion would be to substitute the opinion of this court for the opinion of the jury and the trial court judge, who in the motion for a new trial passed on the same question.   We are not discussing what would be the fair reasonable amount, in our opinion, if we were the jury, but whether the amount awarded is so grossly excessive as to shock the conscience of the court.

The following rule, we think has particular application here, to-wit: "Where it appears from the evidence that the injury complained of has proven or is liable to prove permanent, the appellate courts are little inclined to interfere on the ground of excessive damages.   Indeed, the courts have gone so far as to refuse interference on the grounds of excessive damages not only where there is a probability of permanent injury, but where the evidence shows that a possibility exists.   Even where the evidence is conflicting as to the permanency of the injury or where the recovery is doubtful, the courts will not set aside a verdict as excessive."   (13 Cyc. 130.)

MR. JUSTICE SMITH delivered the opinion of the court.

This action was commenced on May 18, 1911, by the plaintiff, Emerson, against the Butte Electric Railway Company, a corporation, and J. R. Wharton, defendants, to recover damages for personal injuries alleged to have been suffered on the 9th day of May, 1911, while plaintiff was traveling on one of the cars of the defendant company as a passenger.   The complaint alleges that the car upon which plaintiff was riding was derailed by reason of the carelessness and negligence of the defendant company and Wharton, its superintendent, and that by reason

of such derailment plaintiff was thrown about the car, at and against various objects and persons, and injured in his spine and back, in his hip-bones, in his right side, his lumbar sacral regions, his head and various other parts of his body. He was thirty years of age, capable of earning $3.50 per day, and it is alleged that he is suffering from traumatic neurasthenia and is permanently injured. Defendants filed a general demurrer to the complaint, which was overruled. They then jointly answered admitting the car was derailed and plaintiff "was thrown about somewhat but not with great or serious force or any violence." Substantially all other allegations were denied. The court granted a motion for a nonsuit as to the defendant Wharton. The trial resulted in a verdict for the plaintiff and against the defendant corporation for $2,750. From a judgment on the verdict and a motion denying a new trial, plaintiff appeals.

1. Plaintiff having been a passenger, the complaint is sufficient under the rule laid down in *Pierce* v. *Great Falls & C. Ry. Co.*, [1]     22 Mont. 445, 56 Pac. 867, *Hoskins* v. *Northern Pac. Ry. Co.*, 39 Mont. 394, 102 Pac. 988, *Knuckey* v. *Butte El. Ry. Co.*, 41 Mont. 314, 109 Pac. 979, and *John* v. *Northern Pac. Ry. Co.*, 42 Mont. 18, 111 Pac. 632. A presumption of negligence on the part of the carrier arises from the mere happening of an accident resulting in injury to a passenger, which is caused by some agency over which the carrier has control.

2. There was no misjoinder of parties defendant. (*Knuckey* [2]   v. *Butte El. Ry. Co., supra.*)

3. It was competent to show how many people were on the car [3]    and where they were situated, not as an attempt to prove a different ground of negligence from that stated in the complaint, but as part of the *res gestae,* illustrating the situation of the plaintiff.

4. Dr. Horst, a witness for the defendant, had testified in [4]    chief, in answer to a hypothetical question, that he did not think the plaintiff could have been permanently injured. Counsel for the plaintiff on cross-examination, evidently reading from a medical work entitled "Accident and Injury" by Bailey, asked: "Well, this author states a case as follows: [Then fol-

lowed a narrative of the case of a woman who was in a street-car accident, giving her symptoms, *etc.*, described as "the customary neurasthenic symptoms," and concluding with the statement that she became worse rather than better after a settlement with the street-car company]. Do you agree with that statement as a case of traumatic neurasthenia?" The answer (over objection) was: "It is not a typical case, because we start in with a sick woman. She was a neurotic woman. This is not a typical case." It is now contended that the court erred in allowing the question. We do not think so. At least we do not think the court abused its discretion. This court in *State* v. *Penna,* 35 Mont. 535, 90 Pac. 787, by Mr. Chief Justice Brantly, held, in effect, that counsel might properly incorporate into a question a quotation from a standard work on medical jurisprudence, for the purpose of asking a witness whether he agreed with the statement embodied in it as correct.

5. It was contended, in argument before the bar of this court, that the case of *May* v. *Northern Pac. Ry. Co.,* 32 Mont. 522, 4 Ann. Cas. 605, 70 L. R. A. 111, 81 Pac. 328, should be disapproved and overruled. In that case it was held that in an action for personal injuries the district court, in the absence of legislation, might not compel the plaintiff to submit to a physical examination by physicians or surgeons appointed by the court. However, as no request for such examination was made in this case, the question is not before us.

6. It is also claimed that the defendant by its evidence overcame the presumption of negligence raised by the derailment of the car. We cannot agree with this. While much of **[5]** defendant's evidence was uncontradicted, the jury were not obliged to credit it or give it the weight contended for by counsel. It was still for them to decide whether the charge of negligence was substantiated.

7. It is also contended that the evidence fails to support the verdict. Plaintiff testified: "This particular car that I took was crowded. I did not get a seat. The first thing I knew the car was off the track. I noticed it was off because I was thrown from one side of the car to the other. I was not the only person

standing. The car was full. Everybody went down as far as I could see, on the first bump of the car. I went down. I was first thrown to the right. The seats of the car were facing each other and the sides of both seats were full. As I was thrown forward I landed right close to my hip-bone, touching the point of my hip-bone on a gentleman's knee. I fell on a gentleman's knee with my body. This fall was violent. As I fell the car still bumped up and down. The next motion was that I was thrown on the other side with my back against the side of the seat. The position that I was thrown to then was that I went to the floor. The car bumped considerable as it went along there. I was still lying on the floor when they came to pick me up. I got to the hospital by them calling for a taxi-cab. When I got down to the hospital the doctor examined me, I guess it was Dr. Kistler. After I was examined at the hospital they called for a cab to send me to my room. When I got there I went to bed. I was suffering with pain in my side and the point of my hip-bone. I will say that my back was bothering me and also my right knee. When I went to bed there I was not able to sleep. I got a hot-water bottle and used to put it on my side and on my back. I kept on with that treatment for at least two weeks. I stayed all night in my room on that same night. I went back to the hospital every day. I was taken back to the hospital from my room about 10 o'clock that night. My side was bothering me and I called for the doctor to come down and he suggested that I go back to the hospital. I stayed at the hospital until 4 or 5 o'clock the next day. I then came back to my room. They didn't give me anything in the way of treatment at the hospital, but when I got back to my room they ordered electric treatment. After I went back to my room I again went to the hospital to consult a doctor. I did that until between the 17th and 18th. It was something like eight or nine days that I went to the hospital. Went back to work on the 23d of May. The only treatment I received was electric treatment, consisting of sitting in an electric chair for ten or twelve minutes and sometimes longer, which was ordered by Dr. Kistler. I suppose it was the street-car company that sent me to the hospital and

paid the bill and so forth.  I don't know who it was that furnished me a doctor; suppose it was the street-car company. During the time from the 10th to the 17th I was suffering in my back and in my hip.  My knee was stiff all the time.  I couldn't sleep nights only just at spells.  Twenty minutes was the longest I ever slept.  I was suffering from dizziness in my head.  I was dizzy when I woke up in the morning and even after starting to work if I stooped down any length of time at all I would hoist up and was dizzy, and lots of times I would have to catch the sides of the wall of the drift to keep from falling down.  After I went home from the hospital I was spitting blood for two days. That has entirely disappeared now.  There was not any treatment with reference to putting bandages or plaster on my back. I did not apparently get any benefits from these treatments. About the 19th I went to Dr. Monahan and he gave me a bottle of liniment to rub on my back and he also gave me some powder tablets to take.  He gave me some potash to rub on my side.  As a result of this treatment I seemed to improve a little.  On the 23d I went to work with a drill.  We drilled until noon, and as long as I was standing up I could drill first rate, but after dinner I had to go mucking, and I stood it until about half-past 1, and my back would not stand it any longer and I had to get out.  I again went to work on the 10th of June.  When I went off shift I went home, and from that time to the present time I have been under Dr. Monahan's care.  He said what I needed was to lay off from work, but I wasn't able to because the landlady that I was boarding with wanted her money and she forced me to go to work.  I was broke.  During all of that time I particularly suffered with my hip and my back.  My knee was a little stiff, but I worked the shift.  I still have the dizziness but I ain't quite so bad as it was.  During the last month or six weeks I have improved but very little.  When I work it has the effect on me that I can hardly get out of the mine, especially if I have to run cars.  Lots of times I have to run cars and then I can hardly get out of the mine in the night.  It affects me in the hip and back.  I am not as good a workman now as I was before the injury.  After I work a shift my hip-bone stiffens so

that I can hardly walk for a little while, but if I can sit down and rest for an hour or so it gets a little better. My back bothers me all night. I can't lay on my back all night at all. I have to keep turning. During the time since I went to work in June I have not worked regularly. I have been compelled to lay off. I lay off a day at a time. I am not entirely over the pain in my hip or back. Before the accident I weighed 181 pounds and I now weigh 173 pounds. I do not know whether it was a gentleman or a lady that I was thrown against. As to the visible evidence I had of the injury I will say that my hip became very stiff. There were no bruises or blackening on me outside of my knee. My knee was bruised. I did not mention my knee in my complaint. I did to Dr. Monahan. I did not mention my knee to any doctor that waited on me at the hospital; I never mentioned that at all. I did not mention that until it was something like nine days along. I always was very healthy. I don't know that my appetite was affected to any great extent. When I was crippled in this hip I walked with a cane all the time. I could not run any. I could not dance. I worked at the Badger State mine yesterday and I expect to go back again after the trial. I have never been criticised nor has there been any fault found with my work by my foreman or shift bosses. I frequently have to sit down on the side of the drift with my back to the drift. I certainly would get up if I saw the shift boss coming. I received the same wages as any other miner in the mine during that time. I never made any complaint to my foreman or shift boss or asked for any easier place because of the injury I had. I have complained to my fellow-workmen that I was not able to do a shift's work. I don't know their names. When I went to work on the 10th of June I went to work steady. I think the first I laid off was on the 23d or 24th of June. I was off one shift in July. I couldn't go out on account of my hip. I laid off two days outside of May 23. I haven't been off lately. The extent of my laying off is two days. Dr. Monahan told me there was no subjective symptoms at all.''

Dr. Monahan testified: ''I made a physical examination of Emerson about the 17th of May. I made notes which I will

read: 'Found right hip bone very tender on pressure. Abdominal muscles on right side pain on pressure. Pain on pressure lumbar sacral region [small of back]. Right knee contused and swollen; measured 15 inches; left 14½ inches. Pain existing over right crest of hip bone without cessation, necessitating discontinuing work for a day or two at intervals of every week or ten days.' Conditions remain practically the same. Those are conditions that I discovered from the examination of Mr. Emerson. From that time to this time I have at different occasions made examinations of him to ascertain what the condition of these various injuries were, whether they improved or otherwise. His condition to-day, over the right hip-bone, remains practically the same. As to what his condition will be in the future, I will say that I have treated him and we treat all kinds of cases, and cannot determine what the results will be until the treatment has been tried. In the plaintiff's case the first step in the treatment would be absolute rest. I am not able to say how long it will take before he will be entirely recovered, nor would I give my opinion as to whether he will be ever entirely well again. At the present time his condition has not improved very much. The history of such cases, statistics show that it extends over a period as a rule of several years. I do not know whether he will ever entirely recover from the pains in his hip from which he is suffering now. There is a small percentage of them where the condition becomes chronic before getting well. The majority of the cases never become entirely well. My opinion is that it will be a long time, and perhaps never will he be able to follow his occupation without it interfering with him. The only objective symptom which I found was the swelling and contusion of the knee. That was the only marked contusion I saw. From its appearance it was acute. I would say that there should have been some pain there first where I found the objective symptom of an injury to the knee. I would myself, without his stating anything, have discovered trouble in the right hip, and pain on the abdominal muscles of the right side; they were sore and tender on pressure; and also there was pain on pressure on the lower lumbar sacral region, the small of the back. There were

no surface indications to indicate any trouble there. There was nothing whatever to indicate any trouble there until I applied the pressure, only his statement. He told me that he had pains in various parts of his body. He told me that he had pain in the lumbar region and I looked at it, and there was nothing there to indicate, no contusion or swelling, to indicate any pain whatever. The tissues were normal. When I began to press on that he winced. He told me that he had pains in the back and on the right side. There was nothing there to indicate it from looking at it. I am only impressed with the fact that he has pain there, and he says so and it is illustrated by the physical examination. There is pain there. You can usually tell that on a rigid examination whether there is or not. All the other symptoms have subsided with the exception of this right side. He could be in the condition he is in and work. His general appearance always indicated to me that he was in pain. I know that he was suffering pain from his statements to me and his physical examination; that simply went to pressing on the parts. There was no discoloration other than the knee. There was no sign of an external injury any place else. If that injury to the hip was caused by a blow, very recent blows, there should have been surface indications of it. If it was caused by being thrown against the knee of a gentleman I would not say that there should be some surface indications of an injury caused by that. A blow and a fall would be decidedly different. The fall might result in a muscular injury or deep-seated injury in which there would not be a contusion or mark of any kind on the surface. He might get hurt without there being a surface indication but he might feel it. I would say that that injury could be caused by falling against a man's knee."

Mrs. Anna Bloom testified: "Mr. Emerson was rooming with me. When he was first brought from the hospital he called me and I gave him a hot-water bottle. He was in pain. I noticed a short time after the injury there were streaks of blood in the cuspidor in his room."

Hubert Tonkin, assistant foreman of the Badger State mine, testified: "Emerson has been doing everything as a miner. He

ran a machine, shoveled, set up the machine, ran car, and timbered. I never saw him limping around the mine, or staggering, or acting sore or stiff. He filled the bill perfectly. I never saw him exhibiting any symptoms of pain or agony or suffering of any kind.''

P. F. Tallon, also an assistant foreman, gave similar testimony. He also testified: ''I never noticed him limping or having to use a cane or any support around the mine.''

Mrs. Chas. Noyes testified: ''Mr. Emerson was a boarder of mine on the 10th of May and for about two months after. During the time he was in the house and before he went to work I observed his appearance and his walk and manner. I would say that he was not a man who was failing in weight or failing in health or suffering pain. If he said he lost eight pounds I will say I think he gained eight pounds. [This statement may possibly be attributed, in part at least, to a feeling of professional pride on the part of the good lady.] After the accident I saw him three times a day, regular, after a day and a half. He was regular to his meals after that time. I observed his general appearance as to health and so forth, both before and after the accident, and I thought his general appearance improved greatly. After the accident his appearance was that of a pretty husky-looking man; there was no appearance of anything the matter with him only a little lame. I never saw him with the appearance of being in pain or suffering at all. He was jovial as usual. In my judgment he gained flesh rapidly after the accident. The day after he was hurt he told me he was going to start a suit.''

Mrs. George Noyes testified: ''I used to see Emerson every evening going to dinner. I observed him walking on the street both before and after the 9th of May. I did not observe any difference in his walk only that he had a cane with him and that was all. I observed him when he would meet street-cars. He would limp a little more then. And he would limp a little bit more when he came across anyone whom he knew. I also observed him when he was going along Park street one day and he was going a pretty swift gait; I knew I would have to run to

keep up with him. He was limping about every other step or so; he would take a step and then he would think about it. I used to see him every day on the street. He had a cane walking on the street and every other step or so the cane would reach the ground. I observed him changing his gait coming into the dining room and then he would limp. I waited on him after the 9th of May. His appetite always appeared good to me. I did not see any difference as to being in pain or otherwise. I did not see anything that would indicate that he was suffering or in great pain. As to who I first told of seeing Mr. Emerson taking a step or two and then taking a limp or two, I will say we were joking about it at the house."

Dr. P. H. McCarthy, in answer to a hypothetical question embodying the evidence, testified: "I am positive that the injury was not very severe. If it were a genuine injury the only place you would expect to find it would be in an injury to the spine. If it were an injury to the softer tissues this pain would disappear before, or cause some acute trouble that would justify you in doing something that would do away with that pain before now. If it is an injury to the spine, five months afterward you are bound to find changes in the tissues. The muscles would become weakened, the man's gait would change, he could not work in a raise; I know that; nor he could not run a car; nor a machine in the mine. If you had any injury whatever to the spinal cord you would not be able to work in the mine. You would become dizzy and if you exerted yourself the chances are you would fall down. Taking into consideration the facts set forth in the hypothetical question and from the showing of the length of time the patient followed the occupation of mining under the conditions stated, and judging from the following of the occupation that this patient has followed since the time of the injury, I would say that he was not injured at all. Q. In view of the facts stated in the hypothetical question addressed to you, and in view of the further fact that at all of the times while Dr. Monahan was testifying he stated positively that there was nothing to indicate any pain, injury or suffering, permanent or otherwise, other than the history of the case as stated to him

by the patient himself and the yielding under pressure, and in view of the employment followed by the patient and for the length of time and steadiness of that employment, would you say that those injuries were simulated or real and legal? A. I would say it was simulated.''

Dr. C. H. Horst, in answer to the same hypothetical question, replied: ''I would say that it was an injury of a mild character, a moderate grade injury, but of no permanency whatever. I do not consider that a man who could work and do the work described in this question could be possibly permanently injured. The fact that a man has not any objective symptoms does not conclude the matter that he was not injured.'' Both doctors testified that a physician who was in personal attendance on a patient was in a better situation to judge of the severity and extent of his injuries than one who was simply called upon to answer a hypothetical question.

Dr. H. H. Hanson answered the hypothetical question thus: ''That is the history of a first-class able-bodied man. That injury was just simulated; that's all. If the injury claimed by the patient continued for five months and he pursued the vocation he did, and did the character of work he did, I will say if the man was able to do a good day's work for that length of time he must be in a first-class condition.''

In view of this evidence we cannot say, as a matter of law, that a verdict for the plaintiff was not justified.

8. But it is also contended that the verdict is excessive, so much so that it evinces passion and prejudice on the part of the [6] jury. With this contention we agree. In view of the evidence of how the accident occurred, the history of plaintiff's injuries, the fact that it was within his power to simulate and thus deceive his physician, the further fact that not any of his symptoms, save those observable in his knee, were objective, and his conduct since the accident, together with the amount of the verdict, we do not believe that the jurors were moved by that sense of responsibility and regard for the evidence that should have characterized their deliberations.

The judgment and order are reversed and the cause is remanded for a new trial.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied February 13, 1913.