MAKI, Respondent, *v.* MURRAY HOSPITAL, Appellant.

(No. 6,830.)

(Submitted November 6, 1931. Decided January 13, 1932.)

[7 Pac. (2d) 228.]

*Mr. J. A. Poore* and *Messrs. Kremer, Sanders & Kremer,* for Appellant, submitted an original and a reply brief; *Mr. Poore* and *Mr. Louis P. Sanders* argued the cause orally.

*Mr. F. K. Sullivan* and *Mr. H. A. Tyvand,* for Respondent, submitted a brief; *Mr. Tyvand* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The defendant, Murray Hospital, a corporation, has appealed from an order, made after judgment in its favor, granting the plaintiff, Jalmar Maki, a new trial.

258

Maki brought action against the hospital and Dr. D. K. Worden, of its medical staff, for damages for injuries sustained by him while a patient in the hospital. The complaint filed alleges that on March 20, 1928, Maki was admitted to the hospital, on order of Dr. Worden, for treatment for erysipelas present in his face; that a person so afflicted usually becomes delirious and violent; and that for a period of ten days after his admission to the hospital plaintiff was suffering from "mental derangement" and it became the duty of the defendants to keep him constantly attended by competent nurses and "restrained, guarded and under control and in a safe place," which facts were known, or should have been known, to defendants, but were unknown to plaintiff.

It is then alleged that on March 23, while delirious and violent and unable to care for himself or to know what he did, "through the carelessness and negligence and unskilfulness of the defendants and the * * * agents, servants and employees of said corporation, in failing to give to said plaintiff the care and attention which his condition required, and in failing to properly watch, restrain, control, guard and care for him," the defendants "negligently permitted and allowed" him to leave his bed and to fall from the third floor of the building to the ground, by reason of which fall he sustained serious and lasting injuries, described.

The answer admits that Maki was received in the hospital for treatment for erysipelas and placed in a room on the third floor of the hospital, and denies all other allegations mentioned above. Issue being joined, a jury trial was had.

The plaintiff's testimony was brief. Maki testified to his condition before he entered the hospital and that from then on, until he "woke up" ten days later in his battered and broken condition, he was "unconscious"; he showed his condition after his injury and at the time of the trial, but made no attempt to show in what manner he was permitted to fall or jump from the window of the third floor.

Defendant moved for judgment of nonsuit, which motion was denied, and then introduced testimony concerning the care

given Maki in the hospital and the circumstances under which he received his injuries, as follows:

On March 20, 1928, Dr. Worden, of the hospital staff, found Maki suffering with a well-defined case of erysipelas manifested in his face. He had his patient taken to the hospital where he was assigned to a private room, as the disease is contagious, and assigned to him a special nurse who was required to be in constant attendance and to sleep in the room. Maki ran a temperature of 104 on the night of the 20th, but it receded somewhat thereafter and, according to the doctor, he remained conscious and ate heartily. Up to the morning of the 23d the patient showed no inclination to leave his bed or to become violent, though he was delirious at times.

Several outside physicians testified that, with such cases, it is not customary to place a guard over the patient, as it is not characteristic of erysipelas that the patient has delusions of persecution, fears of attack, or suicidal mania, and even though they show some signs of delirium they need no special attention, but admitted that a delirious patient might be more apt to jump from a window than one who was not delirious.

It is apparent, therefore, that in the ordinary course of the disease with which plaintiff was suffering and the even tenor of the conduct of the hospital, ordinary prudence would not dictate that the hospital staff take any unusual steps to guard and protect the patient from injury. However, what happened on the morning of March 23 was this: While the nurse in charge was in the bathroom washing up the dishes from Maki's breakfast tray, the "house painter" mounted a scaffold in the hall outside Maki's room and peered through the transom, whereupon Maki sprang from his bed, rushed into the bathroom, and told the nurse that a man was coming through the transom to shoot him. The nurse tried to quiet him by telling him that it was only the painter and at the same time tried to restrain him, but he struck her on the eye and stomach, broke from restraint, and jumped from the window.

The plaintiff made no attempt to rebut defendants' testimony and, having rested after introducing certain rebuttal testimony, the defendants moved for a directed verdict. This motion was granted as to the individual defendant and denied as to the hospital; whereupon the jury was instructed and retired, and in due time returned a verdict for the defendant upon which judgment was entered.

Plaintiff moved for a new trial, specifying all of the grounds permitted by statute, and, after a hearing on the motion, the court granted a new trial without disclosing the grounds on which the order was made. We must consider the appeal from this order in the light of the following well-established rules:

The granting, or refusal to grant, a motion for a new trial lies within the sound discretion of the trial court, and its order thereon will be reversed only for manifest abuse of that discretion. (*Stettheimer* v. *City of Butte*, 60 Mont. 111, 198 Pac. 455; *Stephenson* v. *Home Ins. Co.*, 67 Mont. 193, 214 Pac. 954, 955; *Gould* v. *Lynn*, 88 Mont. 501, 293 Pac. 968.)

An order, general in its terms, granting a new trial, will be upheld if it can be sustained on any ground stated in the motion therefor, and such an order will not be set aside as readily as an order denying a new trial, since the latter ends the case, whereas the former merely restores the parties to the position they occupied before the trial. (*Northwestern Elec. E. Co.* v. *Leighton*, 66 Mont. 529, 213 Pac. 1094; *Loncar* v. *National Union Fire Ins. Co.*, 84 Mont. 141, 274 Pac. 844.)

Among the grounds specified in the notice of motion and recognized by the statute (sec. 9397, Rev. Codes 1921) is "error in law, occurring at the trial and excepted to" by the plaintiff, which includes error in instructions. (*Kleinschmidt* v. *McDermott*, 12 Mont. 309, 30 Pac. 393.)

It seems to be conceded that the new trial was granted because the trial judge was persuaded that error was committed in refusing to instruct the jury that "the plaintiff is not required to show particularly what the specific act of negligence was which produced the accident, but is only required to show that the accident is one which would not ordi-

narily occur had reasonable or ordinary care been employed,''
and that ''when the thing which causes injury is shown to be
under the management of the defendant, and the accident is
such as, in the ordinary course of things, does not happen if
those who have the management use proper care, it affords rea-
sonable evidence, in the absence of explanation by the defend-
ant, that the accident arose from want of ordinary care,'' and
in narrowing the issues by instructing the jury that ''the only
negligence relied upon by the plaintiff * * * is the al-
leged negligence * * * in failing to so restrain the plain-
tiff as to prevent his jumping from the window. * * * ''

Having thus narrowed the issue, as to negligence, the court
instructed the jury that the burden rested upon the plaintiff
to prove this negligence by a preponderance of the evidence,
and emphasized the fact by restatement in at least three in-
structions, coupled with the positive declaration that ''in the
absence of proof the presumption of law is that the defendant
was not guilty of any negligence and the mere fact that the
plaintiff was injured, does not itself create any presumption
or inference of any negligence on the part of the defendant.''

If this is an ordinary personal injury action and the plain-
tiff did rely solely upon alleged negligence in failing to re-
strain him from jumping from the window, the court correctly
instructed the jury, and, as the plaintiff was unable to prove
any negligence in this regard, the jury could have returned
no other verdict than it did.

If the court adopted the correct theory in instructing the
jury, it should have applied those rules of law at the close of
plaintiff's case and granted defendants' motion for a nonsuit.

It is apparent from the record that plaintiff had no knowl-
edge as to how he received his injuries, or in what manner
the defendant hospital was negligent, if at all, in permitting
him to reach a stage where he could be so injured, but he
knew, as an ordinary reasoning being, that an unconscious
patient in a hospital would not ordinarily receive such inju-
ries unless those to whose care he had been committed were,
in some manner, negligent. So handicapped by absolute igno-

rance of the facts which might disclose negligence, he alleged not only that he was permitted to fall from the upper story of the hospital, but to leave his bed theretofore, because, while he was in a condition wherein he was unable to care for himself, which condition extended from the time he entered the hospital until after he received his injuries, by reason of the carelessness, negligence, and unskilfulness of the agents, servants, and employees of the hospital, the defendants failed "to give to said plaintiff the care and attention which his condition required" and failed "to properly watch, control, guard and care for him." The allegations are as broad as they could be made and cover any act of omission or commission with reference to the duty owed plaintiff by the hospital from the time of his entry until the moment he jumped from the window. His proof was, likewise, merely general and there is nothing in the record to warrant the declaration that the plaintiff relied solely upon the failure of the defendant's agents to restrain him at the moment he did jump from the window; its duty attached long before that moment. The instructions, therefore, did not correctly state the issues. (*Durfee* v. *Dorr,* 123 Ark. 542, 186 S. W. 62; s. c., 131 Ark. 369, 199 S. W. 376; *Williams* v. *Hospital Assn.,* 21 Cal. App. 359, 131 Pac. 888.)

While it is necessary, in every personal injury case, to *prove* negligence, courts, generally, recognize the fact that persons are often injured in such manner, or through such instrumentalities, that it would be impossible to prove the facts showing negligence, and yet, by common knowledge and experience, it is clear that such injury would not have been sustained, ordinarily, had the responsible party not been negligent. Under such circumstances the application of the ordinary rules of evidence would work manifest injustice and render the maxim "for every wrong there is a remedy" (sec. 8752, Rev. Codes 1921) nugatory by denying one, patently entitled to damages, satisfaction merely because he is ignorant of facts peculiarly within the knowledge of the party who should, in all justice, pay them. Consequently, in order that justice may prevail, in

such cases the courts, generally, apply the doctrine of *res ipsa loquitur,* or "the thing speaks for itself."

This doctrine is not an exception to the rule that the burden is on the plaintiff to prove actionable negligence, nor does it permit a recovery on mere proof of the injury; it merely "has the force of a disputable presumption of law and supplies the place of proof necessarily wanting" when the injured party cannot disclose the cause of his injury, but it is apparent prima facie that the accident would not ordinarily have happened had the defendant exercised ordinary care. (*McGowan* v. *Nelson,* 36 Mont. 67, 92 Pac. 40; *Lyon* v. *Chicago etc. Ry. Co.,* 50 Mont. 532, 148 Pac. 386; *Johnson* v. *Herring,* 89 Mont. 420, 300 Pac. 535.)

Further, this doctrine is not, as sometimes said, proof of negligence by a species of circumstantial evidence, the inference to be drawn by the jury from the probability of negligence resting, not upon evidence, direct or circumstantial, but upon a postulate from common experience that accidents of the kind involved do not ordinarily occur in the absence of negligence. (See lengthy note, L. R. A. 1917A, pp. 1–177.)

Mr. Justice Holmes has said: " '*Res ipsa loquitur,*' which is merely a short way of saying that, so far as the court can see, the jury, from their experience as men of the world, may be warranted in thinking that an accident of this particular kind commonly does not happen except in consequence of negligence, and that therefore there is a presumption of fact, in the absence of explanation or other evidence which the jury believe, that it happened in consequence of negligence in this case. Presumptions of fact, or those general propositions of experience which form the major premises or particular conclusions of this sort, usually are for the jury. The court ordinarily confines itself to considering whether it can say that there is no such presumption, or, in other words, that such accidents commonly are not due to negligence." (*Graham* v. *Badger,* 164 Mass. 42, 41 N. E. 61.)

Dean Wigmore, after stating the conditions of the rule, adds that "the particular force and justice of the presumption re-

garded as a rule throwing upon the party charged the duty of producing evidence consists in the circumstance that the chief evidence of the true cause, whether culpable or innocent, is practically accessible to him, but inaccessible to the injured party.'' (4 Wigmore on Evidence, sec. 2509.)

While the application of the doctrine is usually made in view of injury by machinery and instrumentalities under the exclusive control and operation of the defendant, from its very nature as a doctrine of necessity it should apply with equal force in cases wherein medical and nursing staffs take the place of machinery and may, through carelessness or lack of skill, inflict, or permit the infliction of, injury upon a patient who is thereafter in no position to say how he received his injuries. In such cases the doctrine of *respondeat superior* applies (*Mulliner* v. *Evangelischer, etc.,* 144 Minn. 392, 175 N. W. 699), and the doctrine has been applied directly in hospital cases where it appeared that patients had been injured by the improper application of hot-water bottles, and the like, and particularly to negligence in failing to provide competent nurses, where the cause of the injury was unknown to the injured party. (*Meyer* v. *McNutt Hospital,* 173 Cal. 156, 159 Pac. 436; *Adams* v. *University Hospital,* 122 Mo. App. 675, 99 S. W. 453.)

In fact, a careful reading of the numerous cases in the books dealing with injuries received from jumping from the window of a hospital (for this is not a unique case) demonstrates that, while this doctrine is not discussed, the question of negligence could never have been submitted to the jury, or considered by the court, except by applying the principles of the doctrine. (See *Davis* v. *Springfield Hospital,* and cases therein considered, 204 Mo. App. 626, 218 S. W. 696, 698, and notes 22 A. L. R. 347, and 39 A. L. R. 1431.) Thus, in *Richardson* v. *Dumas,* 106 Miss. 664, 64 South. 459, 460, practically on all-fours with the case at bar, the court said: ''The very nature of the occurrence, shows a prima facie case of negligence in failing to exercise due care in nursing and looking after the patient.'' The doctrine applies.

It follows that the court erred in refusing the requested instructions and misled the jury by requiring the plaintiff to prove alleged negligence which is supplied by the doctrine (45 C. J. 1199), and in declaring that "the law presumes that the defendant was not guilty of any negligence." (*Smith* v. *Hollander*, 85 Cal. App. 535, 259 Pac. 958.)

As heretofore stated, the allegations of the complaint are broad enough to permit testimony as to any negligence in caring for and watching over the patient, as well as in "restraining him," and the applicable doctrine of *res ipsa loquitur* furnishes prima facie evidence of any such negligence, entitling the plaintiff to have his case go to the jury, unless the circumstances are so satisfactorily explained by the defendant, as to cause the presumption of negligence to "fade away in the face of contrary facts" (*Welch* v. *All Persons*, 85 Mont. 114, 278 Pac. 110, 115), or point to freedom from negligence "with such certainty as to preclude any other reasonable hypothesis." (*Nichols* v. *New York Life Ins. Co.*, 88 Mont. 132, 292 Pac. 253, 255.)

In this state, a presumption, which is "a deduction which the law expressly directs to be made from particular facts" (sec. 10602, Rev. Codes 1921), is "indirect evidence" (sec. 10600, Id.), which can only be overcome by *other* evidence (sec. 10604, Id.), and the explanation of the circumstances given by the defendant must be satisfactory to overcome the prima facie case made, and, unless the evidence is such as to come within the rule in *Nichols* v. *New York Life Ins. Co.*, above, the question is clearly for the jury.

Of course, if the court should have granted defendant's motion for a directed verdict, what was done thereafter would be immaterial. Such a motion is, in legal effect, a demurrer to the evidence (*Barrett* v. *Shipley*, 63 Mont. 152, 206 Pac. 430), and on its consideration every fact must be deemed proven which the evidence tends to prove (*Koerner* v. *Northern Pac. Ry. Co.*, 56 Mont. 511, 186 Pac. 337); consequently, no case should ever be withdrawn from the jury unless the conclusion necessarily follows, as matter of law, that recovery

cannot be had upon any view which could reasonably be drawn from the facts which the evidence tends to prove. (*Wagner* v. *Donald*, 67 Mont. 114, 214 Pac. 1099; *Long* v. *Davis*, 68 Mont. 85, 217 Pac. 667; *Conway* v. *Monidah Trust*, 52 Mont. 244, 157 Pac. 178.) The fact that testimony is uncontradicted is not sufficient to warrant a directed verdict, where inferences to be drawn from the circumstances are open to different conclusions by reasonable men. (*First Nat. Bank* v. *Wilson*, 57 Mont. 384, 188 Pac. 371; *Ball* v. *Gussenhoven*, 29 Mont. 321, 74 Pac. 871.)

Here, the law provides the plaintiff with a case on which he is entitled to recover, unless the defendant explained away the presumed negligence. Let us, then, consider the explanation given, in the light of the foregoing strict rules governing the trial court in ruling on a motion for a directed verdict, remembering that the court *denied* the motion after having seen and heard the witnesses on the stand.

Dr. Worden, Maki's physician and one of the defendants, testified that he was "perhaps" better qualified by experience to testify concerning the disease with which his patient was suffering than were outside physicians. He testified, in effect, that erysipelas is but one of the toxic diseases in all of which delirium may result from fever and toxicity; that, while the mere fact that a patient has erysipelas does not lead a physician to apprehend that he will have "hallucinations, delusions or illusions, the three are part of the delirious stage; there are graduations of distinction between them, but the three of them make up the delirious stage." Speaking of such patients he said: "There are signs by which you can tell what they are likely to do, the higher the fever the more you expect delirium." The doctor explained the symptoms by which one experienced in handling delirious patients could tell when they might become violent, and testified that a nurse's competency to handle delirious patients depended upon her experience with such patients. He said that he thought the nurse in charge as "able to handle" a delirious patient as any nurse

he knew of, but did not say that he knew whether or not she had ever had charge of a delirious patient.

The "nurse," Miss Dushchee, testified that, at the time she was assigned to take care of Maki, she was nineteen years old, a student nurse who had been in the hospital ten months; that it required three years as such student to become a nurse, and during her ten months in the hospital she had helped in nursing patients, some of them suffering with erysipelas, but this was her first "special," in which she had had full charge. She did not testify that she had ever helped with a delirious patient, or even seen one.

Thus we have evidence by the defendant from which the jury might determine that the nurse in charge was, under the doctor's testimony, incompetent to handle a delirious patient.

Maki became delirious for a short time in the early morning of March 22, which fact Miss Dushchee reported to Dr. Worden, who visited the patient that morning and twice during the day. On the morning of the 23d Maki again became delirious; he then labored under the delusion that the nurse had cut off his legs; he continued in that state from 3:30 or 4 until 5 A. M., when he went to sleep; at 6:30 his temperature was 102, and at 7:30 the nurse gave him the regular hospital breakfast tray, manifestly containing solid foods; she admitted that such foods generally raised a patient's temperature. His temperature was not taken at any time after 6:30. Thirty-five minutes later, the patient reached the violent stage of delirium, a condition in part induced, not by "hallucination" of pursuit, but by a man actually appearing at the transom over his door, and it is a fair deduction from the foregoing testimony that the solid food given him raised his temperature to a point where, had he been attended by a nurse experienced in the case of delirious patients, such a nurse would have observed those symptoms which indicate when such a patient is apt to become violent.

What, then, is the duty of a hospital toward its patients, and does the foregoing evidence so conclusively demonstrate a discharge of the duty that the court should have said, as a

matter of law, that the prima facie case made was overcome? In determining this question we must bear in mind that the trial judge, who has the advantage of seeing and hearing the witnesses on the stand and of judging of their credibility from their demeanor, held the contrary.

A hospital conducted for private gain is not an insurer of its patients against injury inflicted by themselves, but is only required to use ordinary and reasonable care and diligence in the treatment and care of patients; however, a patient is entitled to such reasonable care and attention for his safety as his mental and physical condition may require; the degree of such care should be in proportion to the physical and mental ailments of the patient rendering him unable to look after his own safety. (*Hogan* v. *Clarksburg Hospital Co.*, 63 W. Va. 84, 59 S. E. 943; *Tulsa Hospital Assn.* v. *Juby*, 73 Okl. 243, 22 A. L. R. 333, 175 Pac. 519.) This rule has been qualified by limiting it to the "known" condition of the patient, and it is said that "the unbending rule that no one is required to guard against or take measures to avert that * * * which a reasonable person under the circumstances would not anticipate as likely to happen." (*Davis* v. *Springfield Hospital*, 204 Mo. App. 626, 218 S. W. 696, 699; *Torrey* v. *Riverside Sanitarium*, 163 Wis. 71, 157 N. W. 552.) We do not subscribe to the rule laid down in *Durfee* v. *Dorr*, above, which would, in effect, make the hospital an insurer against unforeseeable accident; the "unbending rule" above is undoubtedly correct, but the limitation of the application of the general rule to the "known" condition of the patient is too narrow.

It is the duty of a hospital to use reasonable care to employ only competent physicians and nurses (*Tulsa Hospital Assn.* v. *Juby*, above); the skill required of these must be such as is possessed by others similarly engaged in like communities. (*Kirby's Admr.* v. *Berea College*, 196 Ky. 353, 244 S. W. 775.) Those who by reason of affliction place themselves in the hands of the medical and nursing staffs of a hospital, and agree adequately to compensate the hospital for the care and attention

required by their mental and physical condition, have a right to rely upon the performance of such duty, and it will not do to say that the hospital is relieved from liability merely by showing that those in charge of the patient did not *know* the conditions existing, regardless of what they should have known.

The correct rule is formulated into an instruction, which should be given in such cases, in *Hignite's Admx.* v. *Louisville Sanitorium,* (1928) 223 Ky. 497, 4 S. W. (2d) 407, 409, which, paraphrased reads in part: "If the jury believes from the evidence that the * * * physicians or agents of defendant * * * discovered, or by the exercise of reasonable skill and care should have discovered, that his condition was such * * * at any time before" the accident "that it might reasonably be anticipated that he would" act as he did, "it was the duty of defendants to use that degree of care to have him watched or kept under observation to prevent him from doing so which ordinarily skillful, careful, and prudent persons engaged in caring for and treating persons in his condition would have used."

The question whether or not the defendant's explanation as to the circumstances under which Maki received his injuries was sufficient to overcome the prima facie case made by showing a full discharge of its duty imposed upon it by law, was clearly a jury question, under proper instruction from the court. It is so held in similar cases wherein the question of the sufficiency of the evidence to warrant the verdict and judgment was directly before the court, and not, as here, where the question is as to whether or not we can say on the cold record that the trial judge, who saw the witnesses on the stand and observed their demeanor while testifying, realizing that he had so misled the jury by his instructions that that body could not consider the evidence, was guilty of "manifest abuse of discretion" in granting plaintiff a new trial, so that the matter of defendant's liability can be determined by the triers of fact, in whom the jurisdiction to do so is reposed by our law. (See *Richardson* v. *Dumas,* above; *Durfee* v. *Dorr,* above; *Broz* v. *Hospital Assn.,* 96 Neb. 648, L. R. A. 1915D,

334, 148 N. W. 575; *Wetzel* v. *Hospital Assn.*, 96 Neb. 636, Ann. Cas. 1915B, 1224, 148 N. W. 582; *Ward* v. *Hospital*, 39 App. Div. 624, 57 N. Y. Supp. 784; *Smith* v. *Simpson*, 221 Mo. App. 550, 288 S. W. 69.)

Even in *Davis* v. *Springfield Hospital*, above, on which defendant places its chief reliance, the court held that plaintiff was entitled to have the jury consider one of the two probable methods by which he could have fallen from the upper story of the hospital to the ground.

In certain of the above cases the explanation made by the defendant made a stronger case in its favor than that presented here.

When the doctrine above announced is applicable, as here, the defendant must satisfy the members of the jury, not the court, that it has performed the duty which the law imposes on it, unless the proof is so clear that the minds of reasonable men cannot reach contrary conclusions thereon.

In view of Dr. Worden's testimony that a nurse's competency to "handle delirious patients depends on whether she has had experience with delirious patients," reasonable men may differ as to whether or not the defendant was negligent in not placing such a nurse in charge of Maki immediately on learning that he had become delirious on the morning of March 22.

In the light of the testimony of Miss Dushchee, such men may differ as to whether reasonable care was exercised in feeding this fever patient, or in instructing the nurse on the subject, when it appears that, within thirty minutes after eating from the "customary tray," the patient became violent.

Further, while the physicians testified as to the ordinary course of erysipelas cases and that one did not necessarily anticipate violence from one delirious, no attempt was made to show what, in medical experience, might be the effect on a patient whose mind is clouded by fever and delirium, of the sudden appearance of the face of a man at such an out of the way place as the transom over the door. It may be that it is well known that such an experience, particularly if the hall

was fairly dark, would be sufficient to cause a patient predisposed to delirium to become violent. In the absence of proof to the contrary, the jury might have concluded that such was the case and that the agents and employees of the defendant were negligent in this regard.

When, therefore, realizing that the jury had been misinstructed and misled into believing that the presumption of law was that the defendant had not been guilty of any negligence and so, in effect, instructed that defendant should prevail in the admitted absence of evidence showing negligence and the refusal to instruct that the presumption or inference of negligence in the case took the place of this wanting proof, we cannot say that the trial court manifestly abused its discretion in granting the plaintiff the opportunity to have his case once tried, under our well-established rules governing our action on appeal from an order *granting* a new trial.

Order affirmed.

ASSOCIATE JUSTICES FORD and ANGSTMAN concur.

MR. CHIEF JUSTICE CALLAWAY: I agree that upon the circumstances shown the rule of *res ipsa loquitur* applies in this case. Consequently, the defendant Murray Hospital was called upon to explain how it came about that plaintiff, a patient under its care, jumped from a window, to his serious injury, and that the defendant was not guilty of the negligence charged in the complaint.

To sustain a judgment in favor of plaintiff the proof must show that defendant was guilty of the negligence charged.

Now, the complaint sets forth that the hospital employed Dr. Worden and several other physicians and surgeons, and several nurses "each and all of whom were servants, agents and employees of the defendant corporation, and engaged in the performance of their respective duties as such servants, agents and employees." It avers that plaintiff became a patient of the hospital; that by reason of his erysipelas he was mentally incapable of properly caring for himself or knowing

what he was doing, and it was the duty of the defendants to keep him constantly attended by a competent nurse or nurses, restrained, guarded, and under control and in a safe place where he could not do himself any harm or injury; and that on the 23d of March, 1928, while plaintiff was "under the exclusive charge, care and control of said defendants as aforesaid and while so seriously sick and afflicted with said erysipelas and being delirious and violent therefrom so as to be unable to properly care for himself and know what he was doing, or to be conscious of the danger surrounding him, or to protect himself therefrom," he "was, through the carelessness, negligence and unskillfulness of the said defendants and the said agents, servants and employees of said corporation, in failing to give to said plaintiff the care and attention which his condition required, and in failing to properly watch, restrain, control, guard and care for him while he was in said delirious condition, and by reason of such delirious condition being unable to properly care for himself, carelessly and negligently permitted and allowed by said defendants to leave his said bed and said room and to fall from the said third floor or story of said building to the ground. * * * " No other charge of negligence appears in the complaint.

Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done. (*Kakos* v. *Byram,* 88 Mont. 309, 292 Pac. 909; *Birsch* v. *Citizens' Elec. Co.,* 36 Mont. 574, 93 Pac. 940; *Zanos* v. *Great Northern Ry. Co.,* 60 Mont. 17, 198 Pac. 138.)

As was said by Mr. Chief Justice Nelson in *Harvey* v. *Dunlop,* Lalor's Supp. (Hill & Denio) (N. Y.) 193: "No case or principle can be found, or if found can be maintained, subjecting an individual to liability for an act done without fault on his part."

Mr. Justice Matthews says correctly that a hospital conducted for private gain is not an insurer of its patients against injury inflicted by themselves; it is only required to use

ordinary and reasonable care and diligence in their treatment and care. Also that "a patient is entitled to such reasonable care and attention for his safety as his mental and physical condition may require; the degree of such care should be in proportion to the physical and mental ailments of the patient rendering him unable to look after his own safety." But "no one is required to guard against or take measures to avert that which, under the circumstances, is not likely to happen, or, more accurately, which a reasonably prudent person under the circumstances would not anticipate as likely to happen. No man does, or is required to, take measures to avert dangers which the circumstances as known to him do not suggest as reasonably likely to happen." (*Fetzer* v. *Aberdeen Clinic,* 48 S. D. 308, 39 A. L. R. 1423, 204 N. W. 364, 366.)

In the case last cited the court approved an instruction in which the court told the jury: "That a patient may be delirious or not in control of his mental faculties is not sufficient to put the defendant, its agents, servants, or employees on their guard to prevent self-inflicted injury." They are put on guard "only when they have notice of conduct or language on the part of the patient evidencing an hallucination or a purpose to inflict such injuries."

In my opinion the majority is in error in saying that the instruction, paraphrased from *Hignite's Admx.* v. *Louisville Neuropathic Sanitorium,* 223 Ky. 497, 4 S. W. (2d) 407, should have been given in this case. It is not applicable to the facts.

No question is made as to the competency of Dr. Worden or any other of the physicians, nor was there any criticism of the treatment.

The explanation given by the defendant shows that the injury was not caused by any want of ordinary care, but by an extraordinary action on part of the plaintiff, which could not reasonably have been anticipated. There was nothing to suggest that he would become violent. Plaintiff was assigned to a special room and given a special nurse, and thus isolated only because erysipelas is highly infectious (this is especially

important where other patients are suffering from open wounds), and not because of any apprehension that he might become violent, for violence is not a characteristic of the disease. The physician in charge of plaintiff, Dr. Worden, was competent and experienced in the treatment of erysipelas. He had been connected with the Murray Hospital for six years, "there all the time." He testified that when plaintiff arrived at the hospital on March 20 he was quite sick; that night his temperature went as high as 104. The next day, the 21st of March, he was ill, but better. On the twenty-second his temperature had dropped to 102, and on the night of that day he was a little improved, although the swelling was quite large. "The temperature was down; he was perfectly normal as far as any mental derangement was concerned; he was reported as eating and sleeping well, although he mumbled in his sleep and was quite restless."

Dr. Worden visited the patient three times a day. There was nothing suggesting that the patient would become violent.

Miss Dushchee, the nurse, testified that plaintiff's fever rose in the afternoon, and that is the general course with fever patients. Before the accident his delirium would show in the morning from about 3 to 4:30 o'clock; then he would sleep, and waken rational. On the morning of March 23, after having the hallucination about 4 o'clock that his legs had been cut off, he went to sleep at 5 o'clock and slept until 6:30. His temperature then was 102 and he seemed rational. Dr. Worden knew the patient's condition during the preceding days but had not made his call on the morning of the twenty-third before the unfortunate man jumped out of the window.

Dr. Karsted, a graduate of Johns Hopkins, has practiced his profession in Butte since his graduation in 1902. Erysipelas, he said, is treated like every other acute infectious disease in a hospital. It is not customary to have a special nurse attendant upon a patient suffering from erysipelas, except in a hospital. The doctor said: "I imagine probably one-third of the erysipelas cases I treated were treated in a hospital, and the other two-thirds were treated at home. It is not custom-

ary to guard patients suffering from that disease; * * *
there is no more likelihood of a person suffering from erysipe-
las being delirious than there would be from a patient suf-
fering from pneumonia. It is not characteristic of erysipelas
for the patients to attempt to escape from a room or to do
themselves an injury." Dr. Karsted was an independent
practicing physician not connected with the hospital.

Practically the same testimony was given by Dr. John B.
Frisbee, a physician of twenty-nine years' experience. He
had treated, he would say, over 100 cases of erysipelas, and in
his experience he had no recollection of having had to restrain
a patient, or to have a special guard in the treatment of the
disease. "In my opinion and experience as a doctor and phy-
sician a patient suffering from erysipelas would not be more
liable or more apt to have hallucinations than a patient suffer-
ing from what we term pneumonia."

Dr. J. C. Shields, a physician of thirteen years' experience,
connected with the St. James Hospital, gave practically the
same testimony. He has treated or seen in consultation from
five to seven erysipelas patients a year during twelve years'
experience. It has not been the custom to place people suf-
fering from that disease in a room with windows and doors
barred or to place them in charge of a man nurse or a nurse
of large physical strength, nor to put them in strait-jackets.
This testimony was not contradicted.

In my opinion the evidence shows that Miss Dushchee, the
nurse, was fully competent. I am considering the case upon
the evidence. According to that given by witnesses competent
to express an opinion upon the subject, she had been in ser-
vice at the Murray Hospital for a period of ten months, and
it must be conceded that during that period of time her work
could hardly have escaped the attention of Dr. Worden who
was there all the time. He said: "I was familiar with Miss
Dushchee's competency as a nurse at that time." He knew
plaintiff had delirious spells.

Miss Dushchee testified that she had taken care of erysipelas
cases before, although this was her first "special" assignment

in an erysipelas case. She had been assigned to other cases. Her testimony indicates that she was familiar with fever cases but she was not asked whether she was familiar with delirium. Dr. Worden, however, testified: "I thought that Miss Dushchee was as able to handle a delirious patient as any nurse that I knew of. Nurses handle delirious cases all the time, and I thought Miss Dushchee was thoroughly competent to handle this man, whose weight and size I knew."

Miss Anna Christiansen, assistant superintendent of nurses at the hospital when plaintiff was a patient there, considered Miss Dushchee a competent and capable nurse to be placed in charge of plaintiff. In fact, the reason that Miss Dushchee was assigned to plaintiff was because she was considered a very responsible nurse; Miss Christiansen said it was a contagious case "and we always put our best nurses on contagious cases on quarantine rules; they have to live up to quarantine rules and it takes a competent nurse to do that."

The "solid food" furnished upon the regular tray seems to have consisted of cereal, fruit, toast, coffee. The argument that plaintiff's temperature rose because of the food given him seems too trivial to discuss. It is notable that while plaintiff was served with these trays, and his temperature was 104 when he came to the hospital, it declined and did not again rise above 102. There was a chart kept showing the patient's condition and the doctor did not prescribe any special food so far as the record shows.

Beyond question there was nothing in plaintiff's conduct to suggest that he might become violent before he saw the painter through the transom. (As to this no negligence is alleged.)

The patient, waking at 6:30 with fever at 102, had eaten and enjoyed his customary breakfast from 7:30 to 8; he conversed, seemed rational. About 8 o'clock, seemingly, he slept. The painter, in erecting his ladders, did not disturb him. About 8:05, not later than 8:10, the painter glanced through the transom, observing a patient lying quietly in his bed, apparently asleep. But the patient saw the painter and this quickened him to activity. No one has the temerity to say the

nurse was to blame for this conjunction of events. No one could have anticipated his action. The most skilful nurse in the world could have done no more than did Miss Dushchee. Her battle to save her suddenly maniacal patient from harm is worthy of high praise.

Upon the proof there is nothing whatever to show that any of the doctors or nurses failed to do anything they should have done, or did anything they should not have done. Every charge of negligence contained in the complaint was completely refuted by competent and uncontradicted evidence. This swept away the basis of *"res ipsa loquitur."*

The motion for a directed verdict should have been granted. Had the jury found for plaintiff instead of defendant, it would have been the court's duty to set it aside.

The jury's verdict should be sustained, and the order granting a new trial reversed.

MR. JUSTICE GALEN: I dissent. In my opinion, the doctrine of *res ipsa loquitur* has no possible application in this case. The application of the doctrine as announced herein by the majority carries it far beyond the basic reason for the existence of the rule. The doctrine is based on necessity, raising an inference of negligence, by reason of the superior knowledge or position of a service or instrumentality under a person's management, direction, or control. It is generally applicable to machinery or other instrumentalities of the condition of which the manager thereof or person having the same under control is in better position than the person injured to know the cause of the accident. The obligation of a hospital is simply to provide ordinary care for the safety and care of its patients, and to hold the doctrine of *res ipsa loquitur* applicable in such a case as this, is to make it an insurer. If it did have possible application, then, under the settled law with respect thereto, it was so completely overcome by the uncontradicted evidence introduced by the defendants as to establish the nonliability of the hospital as a matter of law. If ever proper to be considered in this case, it was completely overcome and

destroyed by the undisputed evidence of the defendants. The inference, if one was ever proper to have been drawn from the facts in this case, was so nullified by the defendants' proof as to entirely remove the doctrine from consideration as a matter of law.

Actionable negligence on the part of the defendants is by the plaintiff on his complaint predicated upon the alleged failure "to properly watch, restrain, control, guard and care for him while he was in" a "delirious condition, and by reason of such delirious condition, being unable to properly care for himself, [he was] carelessly and negligently permitted and allowed by said defendants to leave his bed and said room and to fall from the third floor or story of said building." By the evidence submitted in support of the complaint it appears that the defendant D. K. Worden, a physician, was called to see the plaintiff at the latter's rooming-house on the afternoon of March 20, 1928, diagnosed the plaintiff's illness as erysipelas, and after examining the patient said to him in effect that someone should be with him all of the time for a few days. That evening the plaintiff was admitted to the Murray Hospital and was assigned room numbered 300, in care of a nurse. He went to sleep and about ten days later, on April 1, 1928, found himself suffering from the injuries of which he complains.

In his case in chief no testimony whatever was offered in explanation of his fall from the window and resulting injuries of which he complains. He failed to establish a prima facie case. In my opinion, the motion interposed for a nonsuit was well taken and should have been granted. In defense the facts were disclosed, and therefrom it appears that everything reasonably possible or proper was done to guard, protect, and care for the patient. No violation of any obligation or duty resting upon the hospital has been shown. The hospital was not by law, custom, or regulation required to provide the patient with a graduate nurse or special attendant; yet it did provide him with a special nurse of ability. Miss Dushchee, the nurse in charge of Maki, was not a graduate nurse, but

rather a nurse in training; she was nineteen years of age, weighed 135 pounds, and in the emergency did everything which possibly could have been done by the most experienced female graduate nurse. The court should have directed a verdict as to both of the defendants. Therefore, errors, if any, committed by the trial court in its instructions given to the jury are of no consequence.

It is fundamental that where the evidence does not show any negligence on the part of the defendant, there can be no recovery, no matter how free from negligence the plaintiff may have been. There certainly is no presumption of negligence arising merely because the plaintiff was upon the defendant's premises at the time of the accident, nor by reason of the mere fact that he was a patient within the hospital. The hospital cannot be held as an insurer in such cases, and no presumption of negligence is properly indulged in the absence of facts pleaded and established by some substantial evidence. The burden of proving negligence of the defendants by a preponderance of the evidence always rests upon the plaintiff. Where, as in the case before us, the evidence of both parties disproves the allegation of negligence, any possible presumption arising is completely overthrown, and the court should declare, as a matter of law, that the plaintiff has failed to establish his case.

Rehearing denied January 30, 1932.